## STATE EX REL. FRANK J. FEELEY AND ANOTHER v. IDA WILLIAMS AND ANOTHER.[1]

January 11, 1929.

No. 26,947.

See 12 R. C. L. 1107; 4 R. C. L. Supp. 785.

*Oscar Hallam,* for relators.

*Oppenheimer, Dickson, Hodgson, Brown & Donnelly* and *Converse & Converse,* for respondents.

WILSON, C. J.

Habeas corpus on the relation of Frank J. Feeley and Marie Feeley in an effort to obtain the custody of Feeley's daughter, 12½ years old, in respondents' custody.

Frank J. Feeley married Mildred Engemoen. A daughter was born May 4, 1916. She is the subject of this proceeding. The

[1] Reported in 222 N. W. 927.

mother died December 26, 1918. She was ill over one year and her sister, now Ida Williams, one of the respondents herein, cared for the child continually until the mother's death. Shortly before the mother died, she expressed in writing what she termed her dying wish and request, that the aunt, Mrs. Williams, should' have complete charge of the child and that the father should give financial assistance. She also stated that, if the father married again (and Marie Feeley is now his second wife), she wished the aunt to adopt the child. The father did not consent to the adoption. During the mother's illness, the aunt lived in the Feeley home to care for the child and the mother. After the mother's death, the aunt, with the knowledge of Feeley, took the child from Arizona, where Feeleys were living because of the illness of Mrs. Feeley, to the Engemoen home in St. Paul, where they lived until June, 1920, when the father and the present Mrs. Feeley, whom he married on February 4, 1920, came to St. Paul and, against the pleadings of the aunt, took the child with them to Phoenix, Arizona, where they made their home. Grieved by the separation, the aunt, at her own expense, made a trip to Phoenix to visit the child.

The child then lived in the new Feeley home for about four years, during which time they moved to California, where the father embezzled $15,000 to $20,000, and in July, 1924, was committed to the state penitentiary, where he was confined until September 20, 1925. Since then his life has apparently been one of rectitude.

In June, 1924, because of the misfortune mentioned, the child was brought to St. Paul by the stepmother and voluntarily left with the aunt and her husband, the respondents herein, and she has since been in their custody.

During the time the child was in the Feeley home, two children, a boy and a girl, were born, who are now five and six years of age. From December 26, 1918, to June, 1920, while the child was with the aunt, the father was earning $250 to $400 a month, but he contributed nothing for the support or maintenance of his child, except for a few irregular checks sent for a short time after the mother's death. He silently left that burden to the aunt and her relatives,

who unstintingly met the expense and administered a loving care. During Feeley's period of penal servitude he was unable to make any contributions for the child's welfare. He then had nothing saved. Since September, 1925, he has earned from $200 to $350 a month but has not made any contribution for the benefit of the child.

In November, 1924, relators made an effort, in the district court of Ramsey county, by a writ of habeas corpus, to procure the custody of the child, but the court quashed the writ and left her with respondents.

In January, 1928, this proceeding was initiated, and the trial court found that the welfare and best interest of the child required her to remain with respondents. The case is tried de novo before us.

The father has permitted this child to be supported and educated by the aunt and her relatives for over four years without ever suggesting that he wished to aid therein. Indeed it seems that since September 20, 1925, relators have not even written a letter to the child. The record is quite barren of evidence manifesting a father's affection for the child while she has been out of his custody. The father's conduct in these particulars is not controlling but a mere circumstance which we must consider in view of the motherly interest which the aunt has manifested in the child's welfare continually from its birth.

The child is now 12½ years of age. She is in A-seventh grade, junior high school. She is a B-plus student, standing third and fourth in classes of 42. The respondents are fond of the child and love her as if she were their own. They maintain a christian home; the child attends church and Sunday school. She is given music lessons. Her maternal grandfather, who is substantial from a financial viewpoint, says that if the child remains with respondents he will provide her an advanced education and that she will inherit her mother's share of his estate upon his death.

Relators now have a satisfactory home and could properly provide for this child. We are not unmindful of the father's legal right, which in this case is subordinate only to the best interest and welfare of the child. She is now approaching the threshold of

womanhood and, from the standpoint of character development, is at a formative age and place in life. She is the only child in respondents' home. She is happy. She is contented. She wishes to stay where she is. She is surrounded by mutual affection and subjected to proper training. She is of the age and capacity to form a rational judgment, which receives respectful and serious consideration by us. She does not take a harsh attitude toward her father or stepmother, nor is she subjected to any influence of that character. On the contrary, Feeley's lapse of integrity has been studiously concealed from her by the respondents. Her age and intelligence compel us to have reasonable regard for her expressed wishes. Were we to subject her to the desired change upon a stern and arbitrary legal reason, she would doubtless feel that she had been subjected to injustice and unnecessary harshness, which might leave scars upon her disposition or character. Such compulsion might tend to lead to friction, unhappiness and unfortunate circumstances. The presence of the considerate stepmother and her own children gives opportunity for discord, even though the best of intentions continue to exist. Imaginary wrongs are almost as detrimental as real ones. In such delicate matters we must act cautiously and conservatively. We know the present situation. We do not know the results in the proposed plan.

The child's present situation is highly satisfactory, and no one offers any criticism. Just how this child might fit into her father's home is a matter of speculation and conjecture. We have heretofore stated in no uncertain terms that a parent's right to the custody of a child is paramount to the claim of all others, all things being equal. State ex rel. Anderson v. Anderson, 89 Minn. 198, 94 N. W. 681; State ex rel. Lehman v. Martin, 95 Minn. 121, 103 N. W. 888; State ex rel. Renning v. Armstrong, 141 Minn. 47, 169 N. W. 249; State ex rel. Machgan v. Pelowski, 145 Minn. 383, 177 N. W. 627; State ex rel. Fossen v. Hitman, 164 Minn. 373, 205 N. W. 267. But these decisions recognize that this right is not absolute and must yield to the welfare of the child. Gauthier v. Walter, 110 Minn. 103, 124 N. W. 634; State ex rel. Larson v. Halverson, 127 Minn.

387, 149 N. W. 664; State ex rel. Neib v. Krueger, 143 Minn. 149, 173 N. W. 414; State ex rel. Henning v. Gundvaldson, 169 Minn. 335, 211 N. W. 310; State ex rel. Lund v. Anderson, 175 Minn. 518, 221 N. W. 868.

The age and wishes of the child distinguish this case from such as the Hitman case, 164 Minn. 373, 205 N. W. 267. Our decision rests largely upon the judgment of the child. When a child is too young to exercise its judgment, the judgment of the court is substituted for that of the child. The rigid procedure is that the court will examine the child and ascertain its choice. In this case the child was in court, but the record and surroundings disclosed her unquestioned desires, and it was unnecessary for us to question her. The opinion of a child capable of exercising judgment has always been given great weight. Ex parte Hopkins, 3 P. Wms. 151; Rex v. Johnson, 1 Str. 579; Rex v. Delaval, 3 Bur. 1434; In re Wollstonecraft, 4 Johns. Ch. (N. Y.) 80; In re McDowle, 8 Johns. (N. Y.) 328; Mercein v. People, 25 Wend. (N. Y.) 64, 35 Am. D. 653, 664. We recognize that it will be but a few years until this child is free to come and go much as she may wish, and the record does not disclose any evidence to indicate any desire to destroy her confidence and respect for her father. We are of the opinion that it is best for the child to remain with respondents.

There is nothing to indicate that the relators may not be permitted to see the child on reasonable and suitable occasions, taking it for granted that they will do nothing to disturb respondents' custody except by the aid of some judicial proceeding.

The writ is discharged.