IN RE GUARDIANSHIP OF MARGUERITE MADELON CAMPBELL.
RUSSELL A. CAMPBELL v. ALFRED T. BAKER AND ANOTHER.[1]

November 19, 1943.

No. 33,559.

[1]Reported in 11 N. W. (2d) 786.

*Frank J. Collins* and *John Ott,* for appellant.

*Thompson, Hessian & Fletcher, Byron W. McCullagh,* and *John E. Peters,* for respondents.

JULIUS J. OLSON, JUSTICE.

This is an appeal by Russell A. Campbell, hereinafter called petitioner, from a judgment of the district court of Hennepin county entered pursuant to findings and an order affirming an order of the probate court of that county denying his motion to vacate and set aside the appointment of Alfred T. Baker, a physician, as general guardian of the person and estate of petitioner's minor daughter Marguerite M. Campbell.

The nature of the case is such as to require a rather complete résumé of the facts. Petitioner and his wife are residents of Seattle, Washington, and have been such ever since 1917. They were married there in 1919. They have five children, among them Marguerite, whose custody is the bone of contention in this litigation. Two of the children are older than she, a brother 21 and a sister 19. The two younger than Marguerite are girls aged 13 and 6 years.

During 1938, illness and financial reverses found their way into the Campbell home. Both parents became afflicted with tuberculosis. Mr. Campbell's illness had reached such a stage in March 1938 that he was compelled to quit his employment. Until April 1939 he was confined for treatment at a Veterans Hospital. His wife was similarly afflicted and treated at a sanitarium, but for a lesser period of time. At any rate, over a period of some four months the children were deprived of the society of their parents and were taken care of at the homes of different people. During this time Marguerite had been in four different homes and had attended three different schools because of this situation. About Christmas of 1938, Mrs. Campbell had so far recovered as to be able to rejoin her children and reëstablish the family relationship. Thereafter petitioner visited the home from time to time but did not reside there until after his discharge from the Veterans Hospital in April 1939. During the parents' illness, aid had been extended by the Veterans Aid for Dependent Children, augmented by contributions from certain relatives, among others, Dr. Baker and his wife.

The Bakers are childless. Dr. Baker is a practicing physician and surgeon residing at Minneapolis, where he has lived since 1912. In the summer of 1939 the Bakers, accompanied by Mrs. Charles, who is Mrs. Campbell's sister, and Mrs. Hulburd, who is Mrs. Campbell's mother, made a trip to Seattle from Minneapolis and visited extensively with the Campbell family. Up to this point there is no dispute in the testimony. As to what is now to be related there is some dispute, found by both trial courts against petitioner, so we shall recite the facts in the light of the evidence found true by the triers of fact.

It was claimed by the Bakers, sustained by both trial courts, that Marguerite was to go to Minneapolis with them and was to be cared for, educated, and supported by the Bakers as their own child. She was to be given dental and medical care, as to both of which there was need. The day before leaving for Minneapolis, Mrs. Campbell got out all of Marguerite's clothing so that Mrs. Baker might choose the items she thought needed. Marguerite's school report cards covering a period of several years were given to the Bakers. The family album was gone through and many pictures of the family and friends were removed so they could be taken to Minneapolis by Marguerite. Since that time Marguerite has been with the Bakers, and they have in the fullest degree given her all the love, affection, and tender care of real parents. They have spent considerable sums to cure and correct certain defects of her feet. She was put on an appropriate diet. Dental treatment needed was adequately furnished. She has received medical care and treatment from Dr. Baker, including a successful operation for appendicitis.

In the fall of 1939 Marguerite was enrolled as a resident in the Minneapolis schools. This fact was duly communicated to the Campbells. She has made good progress in her schoolwork and has become firmly attached to the Bakers. She has emphatically taken the position that she wants to be with them. Then, too, her testimony discloses that she was and is afraid of her father because he has a "terrible temper"; that he was harsh in his punishment of his children and unkind to his wife; that on more than one occasion she had seen her father strike her mother; and that "many a time mother has had a black eye" caused by her father's bad temper.

Marguerite was born December 26, 1926, and was past 15 when the case was heard below. She is now a young lady of 17.

From time to time, commencing in January 1940, Mrs. Campbell wrote Mrs. Baker asking for Marguerite's return. In the spring of 1941 the parents wrote Marguerite asking her to come back to Seattle; that if the Bakers did not send her back the father would come to Minneapolis to get her. Marguerite wrote her parents

stating that she wished to remain in Minneapolis with the Bakers. Then came to a climax a sharp conflict as to what the original agreement between the parties was. At any rate, petitioner wrote that he would be in Minneapolis about June 6, 1941, and would then expect Marguerite to be ready to return to Seattle with him. At this point, and to frustrate petitioner's obvious purpose, Mrs. Baker petitioned the probate court for the appointment of her husband as general guardian of the person and estate of Marguerite. She was then past 14 years of age and, upon counsel's advice, endorsed and consented to this arrangement. After a hearing before the court, the appointment was made and Dr. Baker promptly qualified. Petitioner then sought by means of *habeas corpus* to get possession of the child, but that proceeding was later dismissed. He then applied to the probate court to vacate the original order appointing Dr. Baker guardian, claiming that the court was without jurisdiction to appoint him; that, in any event, since the parents wanted the child back, any contract or agreement in respect to her custody contrary to the natural right of parents to their own offspring is superior to any contract in respect to custody not resulting in an adoption. Upon that petition, an order to show cause was issued and a very thorough hearing had before the probate court. The Campbells and the Bakers, including Marguerite, were heard. The court concluded that the original order should stand;

"that it would be for the best interests of said minor to remain with her said guardian and the said Bakers in the City of Minneapolis, and to pursue her education in the schools of Minneapolis, Minnesota, rather than to go back with her parents to the City of Seattle and live as a member of their household in Seattle. That said Bakers have in all respects faithfully performed their said agreement with reference to said minor and are ready, able, and willing to carry the same out in the future."

On appeal to the district court, after a full hearing *de novo*, the same result was reached. The record is now before us for final adjudication.

118

■ First to be considered and disposed of is the question of jurisdiction of the probate court to appoint Dr. Baker Marguerite's general guardian.

Our constitution, art. 6, § 7, provides that the "probate court shall have jurisdiction over * * * persons under guardianship." As to who are proper subjects for guardianship, the constitution is silent. However, by legislative enactments going back even to our territorial days, it is clear that our lawmakers have consistently declared, as a matter of public policy, that minors are proper subjects for guardianship. In conformity with long-established statutes and decision law, the legislature in adopting our probate code, provided (Minn. St. 1941, § 525.54 [Mason St. 1940 Supp. § 8992-129]):

"The court may appoint one or two persons suitable and competent to discharge the trust as guardians of the person or estate or of both of any person who is a minor, * * * provided such person is a resident of the county."

■ That Dr. Baker is a "suitable and competent" person to discharge the trust of guardianship is not questioned, nor is that a matter of doubt. So the only question remaining on this phase is whether Marguerite was a "resident" of Hennepin county at the time of his appointment. That she then was and continually had been physically present within the county over a period of practically two years is clearly shown. She was more than 14 years of age, and, with full knowledge and understanding of the import of guardianship and her own custody by virtue thereof, she deliberately chose to join in, and lent every effort towards, the accomplishment thereof. She came here with the full knowledge of her parents that she was to be in the Baker home as a member of the family. In the language of the trial judge, she came here to "live with the Bakers as their own child; that the Bakers agreed, and the father and mother of Marguerite M. consented, that they should and would provide Marguerite M. with a good education, furnish her with suitable and necessary clothing, medical and dental services

and care, and provide for her in their home as if Marguerite M. was a child of their own, all at no expense of the parents."

In State ex rel. Board of Christian Service v. School Board, 206 Minn. 63, 65, 66, 287 N. W. 625, 626, we distinguished "the different legal incidents which the law attaches to" the words "residence" and "domicile." We there held:

"* * * It [residence] differs from 'domicile' in that 'residence simply requires bodily presence as an inhabitant in a given place, while domicile requires bodily presence in that place and also an intention to make it one's domicile' * * *.

"Ordinarily," we said, "the domicile of an infant is, by law, the same as the father's, if living. [Citing cases.] And if a guardian is appointed, the domicile remains within the state of appointment. * * * Generally, the infant has no choice as to his domicile and has no legal power to change it. With respect to residence, the law is more liberal. Where that alone is involved, an infant can acquire one different from that of his domicile or the domicile of his father or guardian. [Citing authorities.]"

We there concluded (206 Minn. 67, 287 N. W. 627) that Minn. St. 1941, § 132.01 (Mason St. 1927, § 2741), "uses the word 'resides' in the sense of residence merely and not in the sense of domicile."

In Restatement, Conflict of Laws, we find this general rule on the subject of Jurisdiction of Courts, p. 116, § 78:

"A state can exercise through its courts jurisdiction over an individual voluntarily within its territory whether he is permanently or only temporarily there."

And that, p. 121, § 81:

"A state can exercise through its courts jurisdiction over an individual who consents to such exercise of jurisdiction."

We conclude that Marguerite was a "resident" of Hennepin county when the appointment of Dr. Baker was made, and that the court had jurisdiction over her person and the subject matter of her guardianship.

■ No one has denied, nor can he deny, the general rule that parents have a *paramount* right to the custody of their children. It is a right given by statute (Minn. St. 1941, § 525.54 [Mason St. 1940 Supp. § 8992-129]), sustained by a long and uninterrupted line of our cases, one of the latest of which is State ex rel. Olson v. Sorenson, 208 Minn. 226, 227, 293 N. W. 241, 242, where many of our prior cases are cited and where we held, touching this phase:

"The principles of law involved are so well settled that they hardly bear repetition. All other things being equal, the natural parents have the paramount right to the care and custody of a child. [Citing many cases.] That right is not absolute, however, and must yield to the child's welfare. If its best interests will be served by granting custody to someone else that will be done. [Citing cases.]"

State ex rel. Feeley v. Williams, 176 Minn. 193, 222 N. W. 927, cited in the Olson case to the proposition that under appropriate conditions a child's wishes may be taken into consideration in determining its custody, was held inapplicable to the facts in the Olson case "because of Beverly's age [the child involved in the proceedings, who was then nine years of age] and her lack of opportunity to become attached to her parents." The Feeley case has been cited with approval in numerous cases and has never been criticized nor its effect limited. There the child was 12½ years of age when the issue of her custody was determined. There, as here, the child was residing in a satisfactory home; and here Marguerite, like the child there (176 Minn. 195, 222 N. W. 928)—

"is now approaching the threshold of womanhood and, from the standpoint of character development, is at a formative age and place in life. She is the only child in respondents' home. She is happy. She is contented. She wishes to stay where she is. She is surrounded by mutual affection and subjected to proper training. She is of the age and capacity to form a rational judgment, which receives respectful and serious consideration by us. * * * Were we to subject her to the desired change upon a stern and arbitrary

legal reason, she would doubtless feel that she had been subjected to injustice and unnecessary harshness, which might leave scars upon her disposition or character. Such compulsion might tend to lead to friction, unhappiness and unfortunate circumstances."

*Cf.* Borg v. Anderson, 73 N. D. —, 11 N. W. (2d) 121, 123.

True, Marguerite's claim that she fears her father and thinks he is harsh and unkind to her mother may be imaginary, but, even so (176 Minn. 196, 222 N. W. 928), "Imaginary wrongs are almost as detrimental as real ones. In such delicate matters we must act cautiously and conservatively."

■ Minn. St. 1941, § 525.56 (Mason St. 1940 Supp. § 8992-135), provides:

"A guardian shall be subject to the control and direction of the court at all times and in all things. A general guardian of the person shall have charge of the person of the ward."

Under our decisions, such guardian virtually occupies the position of a parent. 3 Dunnell, Dig. & Supp. §§ 4107b and 4108; Townsend v. Kendall, 4 Minn. 315 (412). In this situation, Dr. Baker's authority to have custody of Marguerite will stand until that custody is changed by the aid of appropriate judicial proceedings.

Judgment affirmed.

THOMAS GALLAGHER, JUSTICE (concurring specially).

A careful examination of the record convinces me that the parents of Marguerite Madelon Campbell have treated her with the maximum of love and affection normally extended by parents toward children. It is true that in the past misfortune affected the lives of the parents to some extent, and that for four months in 1938 it was necessary for the minor and other children of the couple to live away from home. The claims of the minor otherwise as to mistreatment by her parents seem without foundation and more or less figments of her imagination. The record discloses a noticeable tendency on her part to exaggerate her claims and dramatize her situation.

At no .time did the parents agree or consent to anything beyond permitting their daughter to visit the Bakers for an indefinite period, during which she might continue her education. There was at no time any written or oral consent on the part of the parents that the Bakers should have permanent custody of their daughter or that either of them be designated her guardian.

It is true, they are in a position to offer more financial and material advantages than the parents, but this in itself does not govern the determination of the question here involved. I am convinced that there is no legal basis for the position taken by them here and no legal or moral grounds for depriving the parents of the custody of their daughter. However, the fact that Marguerite, now 17 years old, in her own mind is convinced that the comforts and luxuries she now enjoys are of greater importance than the love and affection of her parents and the love, comradeship, and association of her brother and sisters convinces me that no good would result in now ordering her return to her parents. For that reason, I concur in the majority opinion.

MR. JUSTICE LORING, absent because of accidental injuries, took no part in the consideration or decision of this case.