IN RE WELFARE OF VINCENT FRANKLIN VIRAY.
MONICA VIRAY v. HENNEPIN COUNTY WELFARE
DEPARTMENT.

172 N. W. (2d) 777.

December 5, 1969—No. 41895.

*Smith & Munro* and *Bernard P. Becker,* for appellant.

*George M. Scott,* County Attorney, and *Susanne C. Sedgwick,* Assistant County Attorney, for respondent.

Heard before Knutson, C. J., and Nelson, Sheran, Peterson, and Frank T. Gallagher, JJ.

NELSON, JUSTICE.

Appellant, Monica Viray, appeals from an order of the Hennepin County District Court, Juvenile Division, terminating her parental rights and transferring legal custody and guardianship of her child, Vincent Franklin Viray, to the commissioner of public welfare.

On August 11, 1967, the Hennepin County Welfare Department filed a petition alleging neglect of Vincent, who was born September 30, 1966. On August 18, 1967, Vincent was adjudicated a neglected child on the basis of the mother's excessive consumption of barbiturates and sleeping pills and the fact that on numerous occasions she required medical treatment as a result thereof. Legal custody of the child was transferred to the Hennepin County Welfare Department for a period of 6 months. On August 2, 1968, the welfare department filed a petition for termination of parental rights pursuant to Minn. St. 260.221(b) (1, 4, 5). The petition alleged unfitness of the mother because of the habitual use of narcotic drugs and alcohol, and that the father, Andres Viray, had abandoned the child.

On November 18, 1968, the court found:

"Mother is seriously involved with narcotics and has declined adequate medical help from three different institutions. She remains wholly unfit to care for her child until she has broken the habit and for some time thereafter, such circumstances not appearing to be within the foreseeable future."

The court further found that as to the mother these facts constituted grounds for termination of parental rights pursuant to § 260.221(b) (4). The court then placed the child in the temporary legal custody of the welfare department with instructions to investigate the maternal grandfather's plans and the natural father's plans. With respect to termination of the father's rights, the matter was continued to January 14, 1969.

At the hearing on January 14, 1969, the juvenile court terminated the parental rights of the father and placed guardianship and legal custody of the child with the commissioner of public welfare.

Monica's father, Glen Slack, testified that Monica had problems with narcotic addiction for 4 or 5 years; that she had started at the age of 16 years with tranquilizers, then with reducing drugs, and went on from there to Tuinal. Slack stated that he had changed schools for his daughter, after which she had associated with a group using barbiturates, and that her first hospitalization was for psychiatric treatment. Her next hospitalization was commitment to Glenwood Hills. Following her marriage in the spring of 1965, Monica stayed away from drugs for a while but soon resumed their use.

After Vincent had been taken into custody by the welfare department on August 11, 1968, Monica returned to live with her father. She stayed off drugs for about 11 weeks but then had progressively more severe problems with narcotics. At the court hearing on November 18, 1968, Mr. Slack testified that Monica was almost totally nonfunctional as far as providing for herself with respect to the needs of an average person. Slack stated that he was attempting to get his daughter into the Federal hospital

at Lexington, Kentucky, because she was now using "heavy stuff," such as morphine and heroin.

June Fisher, supervisor of medical records at Willmar State Hospital, testifed that Monica was admitted to Willmar three times in 1968 for drug-addiction treatment. She left Willmar twice without medical permission and the third time at the request of the staff following behavior that required disciplinary action. The medical records of the hospital contain a note by Dr. D. H. Peterson, a member of the staff, stating that as a result of Monica's totally uncooperative behavior, virtually since the date of her admission, she was discharged with the recommendation that she not be returned to Willmar, either on a voluntary or committed basis. The doctor further stated that she should be managed from a correctional standpoint rather than by medical therapy, and recommended a security setting. He also added that in his opinion she should not have custody of her child until she had had at least a year or preferably two years of socially acceptable behavior.

On November 18, 1968, Mr. Slack, Monica's father, testified that he was a police sergeant for the Airport Police and was raising three children: a grandchild, age 6 (not Monica's child); his daughter, age 12; and a son, age 13. He stated that his work duties would make him unavailable to give Vincent the kind of care he would require because of his age, but that Mr. Slack knew of a family who might be willing to take the child. He admitted that he had not discussed this plan with that family. Mr. Slack stated that he was divorced and there was no maternal figure in the home; that he had raised his 6-year-old grandson from the time that he was 2 1/2 years old; but at that time he had his sister living with him to assist in caring for the child and a niece living next door to help him. He stated that he now lived in an apartment away from these people.

On January 14, 1969, Mr. Slack stated that his prior plan for Vincent did not work out but he had found another family who could take Vincent on an interim basis. He testified that his

grandchild had been in a foster placement since March 1968 and that he had deliberately not visited the child since that time for the reason he did not want to be hurt if the child was taken from him. He stated that his final plan was eventually to keep the child full time.

Paul Fisher, a child protection worker with Hennepin County Welfare Department, testified that he had explored the possibility of placement with relatives of Monica. During April 1968 the child was placed at Monica's request with a Mr. and Mrs. Sellner, relatives of the mother, but this placement was unsatisfactory because of Mr. Sellner's jealousy of the child. Vincent was then placed in a neutral foster home.

The foregoing facts present the following legal issues: (1) Are the findings of the trial court terminating parental rights of Monica Viray sustained by the evidence? (2) Following termination of parental rights of the natural mother and after consideration of the maternal grandfather as possible custodian of the child, may a juvenile court commit the guardianship and legal custody of such child to the commissioner of public welfare over the claim of the grandfather where it appears in the best interests of the child to do so?

1. Minn. St. 260.241, subd. 1, of the Juvenile Court Act gives the court the following choices with respect to commitment of guardianship and legal custody of a child following termination of his parents' rights:

"If, after a hearing, the court finds that one or more of the conditions set out in section 260.221 exist, it may terminate parental rights. If the court terminates parental rights of both parents * * *, the court shall order guardianship and legal custody of the child transferred to:

"(a) The commissioner of public welfare; or

"(b) A licensed child placing agency; or

"(c) A reputable individual of good moral character."

In the case before us the court on two separate dates heard testimony from the child's maternal grandfather as to his desire

to have the child. The grandfather admitted on both occasions, however, that he was currently unable to care for Vincent himself since he was employed during the day and had no one to assist him. At the conclusion of the hearing on November 18, 1968, the trial court directed the welfare department to investigate the grandfather's plan to see if it were feasible, a direction which indictes the consideration that was being given to the wishes of the grandfather.

There is no Minnesota case dealing with commitment to a third party following termination of parental rights. However, in custody situations short of final termination, the juvenile court has on many occasions placed children with suitable third parties, including grandparents, when that placement was in the best interests of the child.

In State ex rel. Feeley v. Williams, 176 Minn. 193, 222 N. W. 927, a 12½-year-old child was left with an aunt and uncle over objections of her natural father. In State ex rel. Larson v. Halverson, 127 Minn. 387, 149 N. W. 664, and State ex rel. Neib v. Krueger, 143 Minn. 149, 173 N. W. 414, the custody of a child was left with grandparents over the natural father's objections because the best interests of the child were found to be served by this arrangement. In State ex rel. Burris v. Hiller, 258 Minn. 491, 104 N. W. (2d) 851, the court held that the right of maternal grandparents to custody of their grandchild must yield to the best interests of the child. In New York the custody of children was awarded to a neutral third party rather than to their grandmother. Matter of Glanton v. Children's Aid Society, 30 App. Div. (2d) 798, 291 N. Y. S. (2d) 874.

2. Appellant apparently contends that there should be a schedule of other relatives with whom placement of a child should first be attempted following termination of the rights of the natural parents and prior to commitment of the child to the commissioner of public welfare. Respondent argues that such a schedule would make long-term planning for children all but impossible, and in many cases would preclude using the "best

interest" test relative to placement of children. It is clear that the Juvenile Court Act does not provide such a schedule. Had the legislature intended the construction of the word "family" as used by appellant, it would have provided for appropriate service of notice to relatives other than the parents with respect to the filing of a petition to terminate parental rights and its purpose, and with respect to the time and place of the hearing thereon.

In this case, since Mr. Slack stated that he could not now, or in all probability until the child was of school age, provide physical care for Vincent, if the trial court were bound to consider the grandfather as having a prior right to be given the child's custody, it would be a few years at best before it would be known whether or not this placement was in the child's best interest and whether he could become an integral part of the grandfather's family.

Strangely, the word "adoption" was not used during the hearings and cannot be found in the transcript. It goes without saying, however, that commitment of a child this age to the commissioner of public welfare or to a licensed child-placing agency would make the child placeable for adoption, barring physical or mental limitations. So, to set a schedule of relatives to whom priority should be accorded in determining a child's custody and to require the trial court to exhaust the apparently limitless members of a natural or blood-related family—grandparents, aunts, uncles, cousins, etc.—before being able to finally plan for the child, would deprive many children of the right to a "family" in any meaningful sense of the word.

3. The evidence in the instant case amply supports the findings of the trial court, and even appellant does not dispute this. The only question appears to be as to the disposition. This court said in Molto v. Molto, 242 Minn. 112, 114, 64 N. W. (2d) 154, 156:

"* * * The natural rights of the parents should be carefully safeguarded but not at the expense of their children. In arriving at a solution, the trial court is vested with broad discretionary

powers and in the absence of a showing of arbitrary action in awarding custody of a child, this court will not interfere. It should be kept in mind that a trial court, unlike an appellate court, has the opportunity to see the parties as well as their witnesses, hear their testimony, observe their actions, and weigh the evidence in the light of those factors. In the absence of a clear abuse of discretion the action of the trial court must be affirmed."

It is apparent that the trial court based its decision to terminate the parental rights of Monica Viray on ample statutory grounds. It will be noted that after hearing the grandfather's wishes and observing his testimony on two separate occasions the court made this finding: "Mr. Slack is not ready at this time to take the child * * *." Under these circumstances, and in view of the entire situation as disclosed by the record, we can only conclude, as the court below concluded, that the best interests of the child would be served by committing him to the guardianship and legal custody of the commissioner of public welfare.

The order of the district court, juvenile division, being in all respects according to law, is hereby affirmed.

Affirmed.