# WAYNE R. WALLIN v. JUDITH M. WALLIN. ROYCE WALLIN AND ANOTHER, ADDITIONAL PARTIES DEFENDANT.

187 N. W. (2d) 627.

May 21, 1971—No. 42488.

*Streater, Murphy, Brosnahan & Langford, Julius E. Gernes,* and *Kent Gernander,* for appellant.

*Bentley & Bentley* and *Clinton R. Bentley,* for respondents Royce and Patricia Wallin.

*William L. Christianson,* for respondent Wayne R. Wallin.

Heard before Knutson, C. J., and Nelson, Otis, Rogosheske, and Odden, JJ.

DONALD C. ODDEN, JUSTICE.*

This is an appeal from an order of the District Court of Good-

---

*Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

hue County denying a motion of appellant wife to award her custody of her 6-year-old daughter, Shelly. The child's custody had been granted by a previous divorce decree to respondents Royce and Patricia Wallin, the parents of the child's father, respondent Wayne R. Wallin.

Appellant, Judith M. Wallin, and Wayne R. Wallin were married June 5, 1964, and established residence in Red Wing, Minnesota. Shelly, whose custody gives rise to this appeal, is the only child born of the marriage. In August 1966, they were experiencing marital problems, and in an effort to help resolve those difficulties, Wayne suggested that their marriage would have a better chance of success if they relinquished custody of their child to his parents. The grandparents discussed this proposal with their attorney, who petitioned the probate court for their appointment as guardians of the person and estate of Shelly. That court issued an order appointing the grandparents guardians of Shelly on October 6, 1966.

The transfer of Shelly's custody did not solve the underlying marital problems of her parents and sometime prior to Christmas of 1966 Wayne left his wife. Judith, having no funds with which to support herself, went to River Falls, Wisconsin, to live with her parents. Thereafter, Wayne brought action for divorce against Judith and Judith, without funds to hire counsel, made no appearance. A default judgment granting Wayne a divorce was entered on February 24, 1967. By the terms of the divorce decree, custody of Shelly was continued with the grandparents. Thereafter, Judith continued to visit her child from 1 to 2 times per week at the Royce Wallin residence. Wayne left the state, has not supported Shelly, and has only once returned to visit her.

On March 30, 1968, Judith married her present husband, Dennis Holen. Shortly after the marriage, they wrote to the attorney who handled the original guardianship asking what had to be done to secure custody of Shelly. Judith testified that the attorney advised them that the paternal grandparents did not want to give up Shelly voluntarily. Although Judith and her new hus-

band resided a good distance from Red Wing, they did visit Shelly on a fairly regular basis, both before the marriage and thereafter. They brought gifts to Shelly on the Christmas weekend of 1968. Shelly attended her mother's marriage and attended the christening of Judith's son, who was born subsequent to her marriage to Mr. Holen. In the summer of 1969, Shelly spent two weeks with her mother at the Holen home and later that summer accompanied her mother and Mr. Holen on a 2-week vacation to California and Tennessee. The record establishes that at the time of the custody hearing Shelly was 5 years of age and her mother was 25 years of age; that Judith attended church with average frequency; that she was a full-time housewife, and that she was not employed outside the home. Her husband, Dennis, was 23 years of age; had completed 2½ years of college; had average church attendance; and was the director of the Neighborhood Youth Corps Project in the Westby, Wisconsin, area, earning a salary of approximately $7,200 annually. He testified that should custody of Shelly be given to Judith, he would accept the responsibility of supporting the child; that he got along well with her; and that he would give Shelly the same love and affection he would give his own son. At the time of the hearing, Judith and Dennis were living in a comfortable 2-story, 3-bedroom home in Westby. They had the normal amount of debts which most young couples experience and enjoyed the respect and friendship of their neighbors and others in the community. Both Judith and her husband expressed their affection and love for Shelly. The record also establishes Shelly's affection for them.

At the time of the hearing, the grandparents, Royce and Patricia Wallin, were 46 and 45 years of age respectively. The grandfather works full time at a tanning company and the grandmother works full time at the Red Wing Shoe Company. While both are at work, Shelly is cared for by a babysitter who lives two doors from their residence. They live in a new development outside Red Wing and their home is unencumbered except for a small home-improvement loan. The record discloses that

Shelly gets along well with both grandparents; that they both love her deeply; and that Shelly shows great love for them. On one occasion, when Shelly returned from a visit to her mother, she cried and said that she did not want to leave the Wallin home again. On the other hand, the grandmother testified that after the mother and her new husband came for visits at the Wallin home Shelly hated to see them leave. The record further reveals that Wayne, the father of Shelly, did not attend the hearing; that he now resides in San Francisco, California; that he was unemployed at the time of the hearing; and that he last visited his daughter in April 1969.

From the record it would seem that the trial judge was faced with the emotion-charged and insoluble problem often faced by trial courts where custody of a minor child is involved. His frustration is expressed in the memorandum accompanying the order appealed from, in which he stated:

"No matter what the court does in this instance it will seem unfair to some party."

However difficult such decisions may be, they must nonetheless be made in accordance with established principles of law. In determining custody disputes between the mother of a minor child and its grandparents, courts have based their decisions on two basic doctrines. The first of these doctrines stands for the proposition that a mother is entitled to the custody of her children unless it clearly appears that she is unfit or has abandoned her right to custody, or unless there are some extraordinary circumstances which would require that she be deprived of custody. The second doctrine is the so-called best-interest-of-the-child concept, according to which the welfare and interest of the child is the primary test to be applied in awarding custody. Annotation, 29 A. L. R. (3d) 366, 390.

From a very early date this court has recognized both doctrines. In the 1905 case of State ex rel. Lehman v. Martin, 95 Minn. 121, 122, 103 N. W. 888, 889, the maternal grandmother

of the child sought to regain custody from the father. This court said:

"The only question for our consideration is whether, from the evidence submitted, respondent is a fit and suitable person to have the custody and care of his child. His right, as the child's father, both under the statute and at common law, is paramount and superior to that of any other person, and prima facie entitles him to the judgment of the court, unless the evidence shows that the child's welfare demands and requires that she remain with relator. The burden to establish his unfitness is therefore upon relator."

In a similar vein this court in State ex rel. Jaroszewski v. Prestidge, 249 Minn. 80, 89, 81 N. W. (2d) 705, 710, observed:

"However, it is fundamental that parents have a natural right to the child and in order to deprive a parent of custody in favor of a third person there must be grave reasons shown. Factors to establish such grave reasons would be neglect, abandonment, incapacity, moral delinquency, instability of character, or inability to furnish the child with needed care. State ex rel. Nelson v. Whaley, 246 Minn. 535, 75 N. W. (2d) 786. There is a presumption that a mother is a fit and suitable person to care for her child and the burden is on the contestant to overcome that presumption. State ex rel. Platzer v. Beardsley, 149 Minn. 435, 183 N. W. 956."

The principle that the custody of young children is ordinarily best vested in the mother, vital and established as it may be, is distinctly subordinate to the controlling principle that the overriding consideration in custody proceedings is the child's welfare. Cases supporting this proposition are legion. Eisel v. Eisel, 261 Minn. 1, 110 N. W. (2d) 881; Meinhardt v. Meinhardt, 261 Minn. 272, 111 N. W. (2d) 782; Currier v. Currier, 271 Minn. 369, 136 N. W. (2d) 55; Hanson v. Hanson, 284 Minn. 321, 170 N. W. (2d) 213; Fish v. Fish, 280 Minn. 316, 159 N. W. (2d) 271; Schultz v. Schultz, 266 Minn. 205, 123 N. W. (2d) 118.

Thus, it would seem to be a fundamental rule of law that, all things being equal, as against a third person, a natural mother would be entitled as a matter of law to custody of her minor child unless there has been established on the mother's part neglect, abandonment, incapacity, moral delinquency, instability of character, or inability to furnish the child with needed care, Eisel v. Eisel, *supra;* Meinhardt v. Meinhardt, *supra;* Currier v. Currier, *supra;* or unless it has been established that such custody otherwise would not be in the best welfare and interest of the child, Fish v. Fish, *supra;* Aske v. Aske, 233 Minn. 540, 47 N. W. (2d) 417.

It is apparent from the transcript, which we have carefully read, that the evidence presented to the district court was at best inconclusive. The evidence did not establish neglect, abandonment, incapacity, moral delinquency, or instability of character on the part of the mother, nor did it clearly establish what disposition would be in the best welfare and interest of the child. In fact, the trial court specifically set forth in a memorandum made a part of its order that Judith was now settled down; that her present marriage was stable; that she and her husband were respected in their community; and that they indicated a desire and had the ability to care for the child. In contrast, evidence in support of denying the change in custody appears somewhat sparse. Nor does the order of the trial court afford much guidance in this regard. Indeed, the only indication given to this court to substantiate the order denying Judith the custody of her child is the trial court's statement in its memorandum "that it would be *disruptive* to the child to move her *at this time.*" (Italics supplied.)

Under the record here, we cannot sustain the trial court's determination. We are well aware of our decisions in which we have held that in determining matters of custody the trial court is vested with broad discretion, such that its determination will be reversed only if such judgment was a clear abuse of discretion in the sense that the order was arbitrary, unreasonable, or

without evidentiary support. Smith v. Smith, 282 Minn. 190, 163 N. W. (2d) 852; Schultz v. Schultz, *supra;* Fish v. Fish, *supra;* Molto v. Molto, 242 Minn. 112, 64 N. W. (2d) 154. We have no disagreement with that approach, for in custody matters and in domestic relations cases generally, a high regard must necessarily be given to the trial court's discretion. Yet, in view of that broad discretion, it is especially important that the basis for the court's decision be set forth with a high degree of particularity if appellate review is to be meaningful.

In the present case, in so far as can be determined from the record presented, it appears that the natural mother has been denied custody of her child merely on the ground that such transfer of custody might be *disruptive*. It is understandable that a change in surroundings of a child of tender years could be not only disruptive but, in some instances or circumstances, traumatic. This could be especially so in this case where the child is only 6 years old and the only security she has known has come from the home setting of her grandparents.

However, since a change of custody involving small children will be disruptive to some degree in almost all cases, we are reluctant to establish precedent which could prevent a parent from prevailing in a custody dispute for that reason alone.

We are further concerned that the trial court in its memorandum indicated that it would be disruptive to move Shelly *at this time*. Does that imply that if Judith were to renew her motion in the future, the court then would be inclined to give the motion a different determination? This court has held:

"* * * There comes a time in the life of a minor child when the uncertainty of his legal status may have a serious, adverse effect on his emotional stability and sense of security. Under our statute and pursuant to its inherent equitable powers, the trial court may at any time entertain a petition to amend a decree affecting the custody of a child, based on a substantial change in the circumstances of either a party or the child. Except in the most extraordinary cases, the practice of requiring repeated

hearings and leaving the question of permanent custody undecided for an extended period of time is inadvisable and unnecessary. Not only does it unduly engage the attention of already overburdened courts, but it constitutes a serious financial burden on the parties who are required to assume substantial additional legal expenses." Eisel v. Eisel, 261 Minn. 1, 4, 110 N. W. (2d) 881, 883.

Since we are here concerned both with the right of a young mother to custody of her minor child and at the same time with whether such custody would be in the welfare and best interest of such child, this determination may have grave implications, and thus we are of the opinion that the facts and circumstances appearing from the record before us, including the trial court's memorandum, do not offer this court sufficient guidelines to sustain or overrule that court's order. The record simply is inadequate to permit us to determine whether there has been an abuse of discretion. In view of the serious consequences of the decision rendered in a custody case, it is necessary that such a decision be made only after thorough investigation of the facts surrounding the case.

We therefore remand this case to the trial court or a complete hearing wherein additional testimony, including testimony relating to present circumstances, may be received, sifted, and evaluated, and both parties may be given the opportunity to buttress their relative positions. This will also give the trial judge an opportunity to make factual findings more consistent with the evidence. Such hearing is to be conducted at a time and in a manner as the district court may direct, not later than 60 days from the filing of this opinion.

Remanded with instructions.