**In re the Marriage of:**

**Robert J. SEFKOW, petitioner, Respondent,**

v.

**Paula D. SEFKOW, Appellant.**

**No. CO–84–2100.**

Court of Appeals of Minnesota.

July 30, 1985.

Review Granted Oct. 18, 1985.

Charles R. Kennedy, Sally Ireland Robertson, Wadena, for respondent.

Randolph E. Stefanson, Moorhead, for appellant.

Heard, considered and decided by LANSING, P.J., and LESLIE and CRIPPEN, JJ.

## OPINION

CRIPPEN, Judge.

Paula Sefkow appeals from rulings of the trial court in a judgment dissolving the marriage of the parties. We affirm on valuation and division of marital property, but we reverse and modify on issues of child custody and appellant's legal expenses, and we reverse and remand on issues of child support and spousal maintenance.

## FACTS

The parties were married in 1969, two years before they both graduated from the University of Minnesota. In September 1971, Robert Sefkow entered law school at the University of Wisconsin; appellant obtained a teaching position, earning $8,000 to $9,000 annually.

After respondent graduated from law school in 1974, the parties moved to Fergus Falls, where respondent began practicing law. Paula Sefkow took a teaching job, and she also pursued a master's degree at Moorhead State University; she received her master's degree in gifted education in 1980.

The parties adopted Laura Noelle Sefkow, born July 5, 1979, when she was an infant. In order to care for Laura, appellant took a one year maternity leave from her teaching position, and eventually resigned. When Laura was two years old, the parties decided that appellant should take a position with the Montessori school in Fargo, North Dakota, so that Laura could have the educational opportunities offered there. After appellant obtained training, she began a one year internship at the Montessori school, and Laura attended the toddler's program. Each morning Laura made the three-quarter hour trip to Fargo with her mother, and they returned shortly after noon.

The parties then adopted Joanna Joy Sefkow, who was born on April 15, 1982. Appellant did not work during the summer of 1982, and she returned to the Montessori school that fall. Laura continued to attend the school, and Joanna stayed with a baby-sitter during the part of the day when both parties were working. The parties had planned to start Joanna in the Montessori school in January 1984.

The parties agreed before they adopted their children that they would both be active in caring for them. Respondent was

commonly involved in bathing, dressing and feeding the girls in the morning, and he took Joanna to a babysitter. Appellant picked Joanna up when she returned from Fargo. In the evenings, appellant prepared dinner for the family and respondent bathed the children and put them to bed.

In late May 1983, respondent announced a decision to end the marriage. For most of that summer, the children and their mother occupied the couple's cabin, and respondent lived at the family home. On September 23, about four hours before his petition in the case was served, respondent picked up Joanna from the babysitter without notice, and kept her physical custody.

Beginning two months later, pursuant to an agreement of the parties, the children stayed together. Their father had physical care from mid-afternoon on Thursday through early evening on Saturday, plus one other afternoon during the week. This arrangement continued until November 1984, when the trial court issued its decision.

Respondent continues to practice law. His gross income was $82,134 in 1981, $99,751 in 1982, and $120,963 in 1983. Appellant continues to work at the Montessori school in Fargo, where she earns $12,000 per year. She has higher career goals, but the Montessori job provides her children with special education opportunities. She may pursue her doctorate in gifted education, which would require her to leave the Fergus Falls-Fargo area for three to five years of study. If she obtained the doctorate, she could earn up to $32,000 per year, but opportunities in that field do not exist in Fergus Falls. She has made no definite career plans.

The trial court decided that the parties should have joint legal custody of the two children, that Paula Sefkow should provide physical care for Joanna, who is now age 3, and that Robert Sefkow should provide physical care for Laura, who is now age 6. The court's visitation arrangement brings the children together on weekends, holidays, and two summer months. The court added, "that if one parent must be the sole custodial parent, then Mr. Sefkow should be that parent."

The trial court awarded appellant $1,000 per month for child support. Appellant was awarded "as maintenance" her tuition and school expenses only, for two years, if "within three years" she initiates a course leading to a doctorate.

The court found that the net value of the marital estate was $192,368; the estate was equally divided by awarding it to Robert Sefkow, except for $27,000 personal property, and by requiring that he pay $69,000 to appellant in five annual installments. Respondent's property includes his interest in a law practice, a mortgaged home, personal property, and several real estate investments.

The court made a temporary award of $1,500 for appellant's legal expenses, and the court made a final award of an additional $5,000.

Appellant disputes each of the preceding conclusions.

Appellant's brief includes an affidavit which speaks of post-judgment events, and respondent moves that the affidavit be stricken from the record.

### ISSUES

1. Should the affidavit which appellant appended to her brief be stricken?

2. Did the trial court err:

a. In its finding on the value of marital assets, or in division of the property?

b. In its decision to split placement of physical custody of two children, or in finding that the best alternative was placement of both children with respondent?

c. In awarding $1,000 per month child support, without determining respondent's current income?

d. In a decision to deny spousal maintenance, except for a two year tuition-and-books benefit?

e. In awarding only $6,500 for appellant's legal expenses?

## ANALYSIS

### I.

 We can consider only those facts presented at trial. *Holtberg v. Bommersbach,* 235 Minn. 553, 554–55, 51 N.W.2d 586, 587 (1952). The challenged affidavit does not contain facts qualifying for judicial notice. *See Bollenbach v. Bollenbach,* 285 Minn. 418, 175 N.W.2d 148 (1970). Appellant points out that the affidavit relates to the split custody of the children, and that neither party suggested that arrangement nor offered evidence on the subject; these observations do not give us reason to consider new evidence. We do not consider any of the material presented in the affidavit in our decision.

### II.

The trial court's division of marital property must be "just and equitable." Minn. Stat. § 518.58 (1984). Unless it clearly abused its discretion, the trial court's determination must be affirmed. *Bogen v. Bogen,* 261 N.W.2d 606, 609 (Minn.1977).

 Findings of fact on the value of assets must be upheld unless they are clearly erroneous. Minn.R.Civ.P. 52.01. A valuation reasonably supported by expert testimony will be affirmed. *See Johnson v. Johnson,* 277 N.W.2d 208, 211 (Minn. 1979).

 Appellant contends that the trial court undervalued the Fergus Falls home, real estate in Muskegon, Michigan, commercial real estate in Fergus Falls, respondent's interest in a law firm, and certain personal property. All of these assets were awarded to respondent; appellant's award is principally in the form of cash payments.

Except for the law partnership interests, the trial court adopted respondent's valuations on the assets. At trial, appellant presented a financial statement which showed higher values for the real estate; however, in proposed findings of fact, appellant used the same real estate values adopted by the court, contesting only the valuation of the law partnership. Where appellant has acquiesced in respondent's valuations, we will not review a contradictory contention. *Farmer v. Studebaker Corp.,* 126 Minn. 346, 348, 148 N.W. 285, 286 (1914). *See Hess v. Koskovich,* 241 Minn. 174, 179, 62 N.W.2d 806, 809 (1954).

 In an August 1983 financial statement, respondent estimated that the value of his share of the law firm was $70,000; at trial, he presented evidence that the value was $25,000. The trial court noted that the $70,000 included capitalization of respondent's future earnings, which had to be disregarded, and the court valued the partnership at $50,000. As appellant contends, there is no evidence that the $70,000 estimate included capitalization of earnings. Nevertheless, the trial court's finding was well within the bounds of two estimates, and there is no reversible error. *Johnson,* 277 N.W.2d at 211.

 Appellant also points out that the trial court did not make an award of property to compensate her for her contributions toward respondent's law degree, or consider the law degree a marital asset. Because this proposal is raised for the first time on appeal, we do not address it. *Gulbranson v. Gulbranson,* 343 N.W.2d 715, 716 (Minn.Ct.App.1984).

### III.

 The trial court found that its custody decisions were "in the best interests of the children." *See* Minn.Stat. § 518.17, subd. 3. Unless clearly erroneous, that finding must also be upheld. Minn.R. Civ.P. 52.01. We will affirm a child custody decision so long as it is not arbitrary. *Hansen v. Hansen,* 284 Minn. 1, 5, 169 N.W.2d 12, 14 (1969). Further, we must view the evidence in the light most favorable to the trial court's findings. *Id.* at 5, 169 N.W.2d at 15.

We conclude that the trial court arbitrarily disregarded the mother's primary parenting role with each of the children. *See Berndt v. Berndt,* 292 N.W.2d 1, 2 (Minn.

1980) and *Weatherly v. Weatherly*, 330 N.W.2d 890, 892 (Minn.1983).

## A.

■■■■ The order for judgment contains no findings of fact that show what factors supported the decision for split custody and the gratuitous statement of an alternative, the award of sole custody to the father. The parties are entitled to these findings; they serve the appellate process, and they avoid disregard for standards duly legislated for the case. *Rosenfeld v. Rosenfeld*, 311 Minn. 76, 82, 249 N.W.2d 168, 171 (1976). It is important that findings about a custody decision be "set forth with a high degree of particularity." *Wallin v. Wallin*, 290 Minn. 261, 267, 187 N.W.2d 627, 631 (1971).

■■■ The only finding here that has an identifiable relationship to the split custody arrangement is one that probably contradicts it. The findings recite that the children "react" to one another "in a positive way." We are left with the need to look directly to the record to learn whether there is cause for a split custody arrangement.

The findings are similarly sparse on matters having any bearing on the trial court's preference of the father as a custodial parent. Both parents, the findings relate, have "competent parenting skills," are "attentive to the best interests of the children," have "the capacity and disposition to provide the children with love, affection, and guidance," and are "competent to be the custodial parent."

The court's preference for care by the father apparently rests on this additional finding:

Mr. Sefkow has been the parent who has primarily been responsible for the day to day providing of meals, clothing and bathing the children, placing them in bed and providing for their daily physical needs. Mrs. Sefkow has been primarily responsible for the education of the children through her position as teacher as well as mother.

The record does not support a finding that the mother, who cared for the children during major parts of each day, and who prepared evening meals for the family, was a secondary provider for their physical needs. More to the point, even with this recitation, the findings provide only slight particularity in dealing with statutory custody standards, insofar as they relate to the preference of one parent over another.[1]

■■■ Respondent asserts that additional recitations in the findings relate to the statutory criteria. Although that is the case, the findings respondent cites have no bearing on the decisions of the trial court, those to split custody and to declare a preference for the father. It is also the case that the mandate of the supreme court for findings is not in any significant sense

1. The court must consider "the best interests of the child" when determining custody. Minn. Stat. § 518.17, subd. 3. According to subdivision 1 of that section relevant factors include:
 (a) The wishes of the child's parent or parents as to his custody.
 (b) The reasonable preference of the child, if the court deems the child to be of sufficient age to express preference;
 (c) The interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interests;
 (d) The child's adjustment to his home, school, and community;
 (e) The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;
 (f) The permanence, as a family unit, of the existing or proposed custodial home;
 (g) The mental and physical health of all individuals involved;
 (h) The capacity and disposition of the parties to give the child love, affection, and guidance, and to continue educating and raising the child in his culture and religion or creed, if any; and
 (i) The child's cultural background.
Minn.Stat. § 518.17, subd. 1 (1984).
We note the relevance of the single particular finding here, quoted in the text of the opinion, to the "interaction" standard of subdivision 1(c). However, the reference to primary involvement of each parent with different kinds of interaction leaves us without a statement of the trial court on the significance of parental interaction in shaping a preference for one parent.

satisfied by a recitation, like the one made here, that "the relevant factors listed in Minnesota Statutes 518.17, Subdivisions 1 and 2" have been considered and evaluated.

### B.

The custody decisions of the trial court are not supported by the evidence.

The children have been with each other since Joanna was two months of age, except for the two month period in the fall of 1983 after respondent took Joanna from the home. It is undisputed that they have a good relationship. It has been repeatedly recognized in Minnesota that it is "unfortunate" to separate children, and there is no evidence here to suggest otherwise. *Schultz v. Schultz*, 266 Minn. 205, 208, 123 N.W.2d 118, 121 (1963); *Rinker v. Rinker*, 358 N.W.2d 165, 168 (Minn.Ct.App.1984). *See* Minn.Stat. § 518.17, subd. 1(c). In presentations to the trial court, neither party was open to the notion of separating the children during the working days of each week.

 Further, the evidence in this case does not support a custody arrangement that eliminates the primary parenting role of Paula Sefkow. We find the case to come inescapably into the shadows of *Berndt* and *Weatherly*, where the Minnesota Supreme Court reversed custody decisions that overlooked a primary caretaker in assessing the best interests of a child. The trial court's findings erroneously omit the subject of Paula Sefkow's daily parenting role, except as to schooling, and mention only the activities of respondent. *Weatherly*, 330 N.W.2d at 892.

Before the judgment here became effective, in November 1984, Laura Sefkow, whose custody was placed with her father, had been with her mother almost constantly for four and one-half years. For the first two of those years, Paula Sefkow did not work so she could be with the child. During the next two and a half years, Laura attended a preschool program, but her mother was the teacher; the child and her mother traveled together for an hour and a half every school day. The mother provided full-time care during the summers of 1982 and 1983.

Joanna Sefkow is now three years old and she remains in the primary physical care of her mother. This year she attended the preschool program where her mother teaches. During the school years ending in 1983 and 1984, she was with a babysitter on school days until the early afternoon hours, when her mother, accompanied by Laura, came to pick her up. She has been with her mother during the last three summers, except for weekend times with her father in 1984.

When the couple shared time with the children, they shared responsibilities. Paula Sefkow prepared noon and evening meals. She did the housekeeping.

It is undisputed that Paula Sefkow is an emotionally healthy person, that she is specially trained in child development, that she has varied interests, and that she has ably cared for the children.

This evidence demonstrates that the mother has been the primary caretaker of the children.

 It serves the best interests of the children to let them live together. Minn.Stat. § 518.17, subd. 1. These interests are best served by continuing the mother's primary care, having due regard for the interaction the children have had with her (subdivision 1(c)), their adjustment to her home and her school program (subdivision 1(d)), the time they have been with their mother (subdivision 1(e)), and the mother's unusual capacity to give them guidance (subdivision 1(h)).

The evidence shows that respondent has been a dedicated father, one who has made unusual parenting efforts during early morning and evening hours. It was nevertheless erroneous to take from either child the primary parenting of their mother.

### C.

 Respondent argues that "Paula is not disposed to regular and assured visitation of the children with Bob." If this

were true, it would be an important factor in deciding custody; it would bear heavily on the placement that would best preserve relationships enjoyed by the children (subdivision 1(c)), and it would bear on the capacity of the mother to care for the needs of the children (subdivision 1(h)).

The trial court did not indicate that its decision was influenced by this factor, or that respondent's statement is true. In fact, when addressing the prospects for joint legal custody of the children, the court found that Paula Sefkow, as well as her husband, had been cooperative in dealing with a temporary custody arrangement.

There is no competent evidence to support this contention of respondent. The observation traces to a statement of respondent's expert, who had not interviewed appellant. Based on her reading of appellant's deposition, the witness said she was "concerned" that appellant would not support "access" of the children with their father, because appellant had a "misguided notion" about the interests of the children after divorce; the witness said the children should be with a parent who was eager to promote the relationship a child has with the other parent.

Appellant in her deposition said that she was "uncomfortable" with the idea of a 50–50 division of custody, that she "would not find that in the girls' best interests." She also said that the girls needed to have a relationship with their father and that she would do "everything in [her] power" to follow the directions of the court, whatever they might be. The deposition contains no other remarks relevant to the conclusion stated by respondent's witness.

### D.

Respondent further contends that Paula Sefkow should not have custody of the children because her prospective educational plans would take her some distance from Fergus Falls.

The same claim was stated to the trial court, but the findings of fact do not say whether this point explains the court's decision to change the primary care arrangement for Laura Sefkow. It is evident, however, that the court gave some heed to the argument; appellant's care of Joanna was expressly conditioned on her residence "in either Fergus Falls or the Fargo-Moorhead area." Given this decision, and the inadequate explanation for placement of Laura, we give deliberate attention to the argument.

Respondent's claim seriously disturbs the balanced scheme of law shaped by controlling legislation and the decision of the Minnesota Supreme Court in *Auge v. Auge*, 334 N.W.2d 393 (Minn.1983). We cannot permit that result.

We give unyielding heed to *Auge*, not to enhance the privileges of one parent, but to preserve a rule of law carefully crafted to deal evenhandedly with the interests of the child and each parent. To explain, it is important to note that *Auge* announces two major concepts:

1. First, unnecessary limits on movement of the family unit unlawfully interfere with the stable circumstances of a child. *Id.* at 396, 397, 399. Removal will be prohibited if it is shown that it contradicts the best interests of a child, and the noncustodial parent is entitled to a hearing on that issue upon a showing by affidavit of a prima facie case.[2] *Id.* at 397, 399.

2. Second, the law does not permit sacrifice of visitation rights protected by Minn.Stat. § 518.175, subd. 3 (1984). This section provides:

If the purpose of the move is to interfere with visitation rights given to the noncustodial parent by the decree, the court

---

**2.** The supreme court prescribed this approach for those "many cases" where denial of a move would be tantamount to a change of custody. *Auge*, 334 N.W.2d at 397. To date, only one case has been found to be outside that category, the care arrangement where "both parents are equally involved with the child's care." *Hegerle v. Hegerle*, 355 N.W.2d 726, 731 (Minn.Ct.App. 1984).

shall not permit the child's residence to be moved to another state.

Removal must be denied if this purpose is shown. *Auge,* 334 N.W.2d at 400. Moreover, the recognized purpose of the statute is to "safeguard" visitation rights. *Id.* at 397. The opinion implies that the freedom to move depends on maintaining visitation which is a "reasonable alternative" to present rights, visitation that is "reasonable and necessary" to maintain a good relationship between the noncustodial parent and the child. *Id.* at 398, 400 (citation omitted).[3]

■■■■ *Auge* dealt with a proposal for a move after the rights of the parties were determined by judgment. Here the issue arises during trial, and respondent would have the court destroy the limited freedom to move by taking custody from the primary parent at once. There is no credible evidence that appellant wishes to impair the relationship of the children with their father. Neither reason nor equity permits the courts to employ a rule of law in the original judgment that so conflicts with the law announced in *Auge.* To hold otherwise would unjustly reward the anticipation and avoidance of an important rule of law.

The uncertain prospect of appellant's future move does not support a choice to place custody of Laura Sefkow with respondent. Having regard for statutory law on changes of residence, and the rules of law announced in *Auge,* residential conditions on the placement of the Sefkow children are unnecessary and unlawful.

### E.

■■■■ The trial court's choice of a joint legal custody arrangement is supported by its findings and by sufficient evidence. In fact, when the issue is separated from contentions of the parties on the physical care of the children, the decision for joint legal custody appears to be undisputed.

The trial court chose joint legal custody in the context of other custody decisions that are reversed on appeal. If these changes substantially alter the continued prospects for joint legal custody, the issue has to be resolved in future proceedings.

### F.

■■■■ The trial court described its custody arrangement as one of joint physical custody. Under the controlling statute, joint physical custody includes any plan where the "routine daily care and control and the residence" of children is "structured between the parties." Minn.Stat. § 518.003, subd. 3(d) (1984).

When one parent provides care for children during the working part of each week, it is pointless to debate whether the arrangement is one of joint physical care or one with physical care placed with one parent and visitation benefits with the other. We have concluded that primary parenting care should be provided for the children by their mother. To avoid unnecessary litigation on the details of the arrangement, we conclude it should be cast initially in a traditional award of physical custody subject to reasonable visitation rights of the father. *See* Minn.Stat. § 518.175 (1984).

### IV.

When addressing the topic of spousal maintenance (Part V below), the trial court found that Robert Sefkow had $66,000 "spendable income over the past three years," based on a subtraction of taxes, IRA contributions and Keogh contributions, from average gross income of $100,-949 between 1981 and 1983. In the same paragraph, the court found that Paula Sefkow currently earns $12,000 annual gross income.

Without other findings of fact or any substitute explanation, the trial court found respondent "shall pay" $1,000 per

---

**3.** There are no appellate decisions in Minnesota which review trial court findings of fact on the reasonableness of available alternatives. *See Meyer v. Meyer,* 346 N.W.2d 369 (Minn.Ct.App. 1984), where the trial court apparently made no such findings. Appellate decisions reflect unqualified judicial support for steps that preserve the relationship of the noncustodial parent and the child. *Shepard v. Shepard,* 352 N.W.2d 42, 46 (Minn.Ct.App.1984).

month support for Joanna Sefkow, plus medical costs for both children.

■■■■ The trial court's finding on average spendable income between 1981 and 1983 does not constitute a determination of respondent's current net income for purposes of child support guidelines. Minn. Stat. § 518.551, subd. 5 (1984). Respondent's gross income increased 21.4 percent in 1982, and 21.3 percent in 1983. He is actively engaged in a law practice and there is no evidence that his 1981 or 1982 earnings reflect his income in 1984 and 1985. Net income is not reduced by voluntary retirement account contributions. *Id.*

■■■■ In appropriate cases, the trial court may depart below statutory child support guidelines. Minn.Stat. §§ 518.17, subd. 5, and 518.551, subd. 5(e). Both these sections condition departure on express findings to show reasons for the decision, findings which would normally address facts on needs and resources of the parties; specific standards on needs and resources of each party and the children are set forth in Minn.Stat. § 518.17, subd. 4. Just as the findings here do not show Robert Sefkow's current net income, they do not indicate his current financial resources. Minn.Stat. § 518.17, subd. 4(e). His financial needs are not addressed. *Id.* The needs of appellant and the children are not addressed. Minn.Stat. § 518.17, subd. 4(a)–(d). *See Letourneau v. Letourneau,* 350 N.W.2d 476 (Minn.Ct.App.1984); *Kreidler v. Kreidler,* 348 N.W.2d 780 (Minn.Ct. App.1984). A finding on Paula Sefkow's gross earnings does not sufficiently indicate her financial resources. Minn.Stat. § 518.17, subd. 4(b).

We cannot act for the trial court in determining these facts and the matter is remanded for findings and conclusions on child support for the two children.

### V.

■■■■ Minn.Stat. § 518.552, subd. 1 (1984) permits an award of spousal maintenance to appellant if she has too little "property" to provide for her "reasonable needs," especially during a period of education, or if she cannot "adequately support" herself from her earnings in "appropriate employment." The statute expressly addresses one "appropriate" reduction of earnings, employment plans made to accommodate care of children at home. *Id.*

The statutory criteria for the "just" amount and time of maintenance include the resources of each party, the duration of the marriage, contributions of each spouse to the marriage, time the recipient needs for education leading to "appropriate" employment, and the couple's previous standard of living. Minn.Stat. § 518.552, subd. 2. "Courts have interpreted the statute to require a balancing of the supporting spouse's financial needs and capacity against the other spouse's financial needs and capacity." *Otte v. Otte,* 368 N.W.2d 293, 297 (Minn.Ct.App.1985). The determination of whether to award support is discretionary, but that discretion must be examined in light of controlling statutory guidelines. *Erlandson v. Erlandson,* 318 N.W.2d 36, 38 (Minn.1982).

Here the court awarded appellant tuition and books for two years of graduate education, and the court refused any other form of maintenance. Because of appellant's "marketable skills," the trial court found she was "not in need" of rehabilitative maintenance and not entitled to maintenance to offset a reduced standard of living. We conclude that this finding is clearly erroneous and that the trial court's assessment of just maintenance was an abuse of discretion.

■■■■ During this 15 year marriage, Robert Sefkow has pursued his career without interruption. Appellant's employment maintained the couple during respondent's three years in law school. Since 1979, Paula Sefkow has mixed her career plans with the family plan the couple chose to pursue. Her current earnings are reduced because of employment chosen to accommodate the needs of two children, now ages six and three. Respondent's 1983 gross earnings were ten times the salary appellant enjoyed in 1984. Paula Sefkow has longstanding

interest in an advanced degree. These factors mandate short-term maintenance, in an amount depending on determination of appellant's financial needs.

■ At trial, appellant estimated she would need annual income of $48,000 to provide for herself and the children in the family home at Fergus Falls. The home was awarded to respondent, and the trial court anticipated that appellant could find housing at a cost less than about $14,000 per year needed for the home. Because appellant now lives in Fargo, where she works, she saves some travel expenses included in her original estimate. Appellant's reasonable needs include a monthly sum to be used or set aside for her further education.[4]

■ The trial court, not this court, should make a finding as to the amount of appellant's reasonable and necessary expenses. These expenses are substantially in excess of her current spendable earnings and the benefits she gets from a modest property settlement. The trial court must also determine whether appellant has any reasonable alternative employment opportunities which would increase her earnings. Unless child support is much greater than presently provided, and sufficient to cover the gap between appellant's needs and resources, the trial court must determine an appropriate amount of maintenance.

Absent credible findings demonstrating that appellant's reasonable needs are otherwise met, we conclude that she is presently entitled to maintenance benefits for a period of 60 months.

### VI.

After trial, appellant reported to the court that her legal expenses totaled $18,-250. She currently reports almost $10,000 in expenses on appeal, together with a $2,000 upward adjustment of fees incurred before appeal. The reasonableness of these costs has not been disputed.

The awards for expenses, totaling $6,500, covered about 35 percent of the costs reported to the trial court. The court gave no explanation for its decision on the final award.

■ Under Minn.Stat. § 518.14, the trial court may award attorney fees. The standard for granting fees is a spouse's need for financial assistance to enable her to protect her interests in dissolution proceedings. *Abuzzahab v. Abuzzahab,* 359 N.W.2d 329, 333 (Minn.Ct.App.1984). Trial courts have broad discretion to award attorney fees, and the award will not be disturbed in the absence of a clear abuse of discretion. *Solon v. Solon,* 255 N.W.2d 395, 397 (Minn.1977).

■ The disparity in the financial circumstances of the parties is large. The investments of the couple were awarded to respondent, and an offsetting award is payable over time. Respondent's income and his potential earnings are much greater than appellant's.

We find inescapable the conclusion that the limited expense award parallels unjust denial of spousal maintenance and child support, and the abuse of trial court discretion on child custody issues.

In the unusual circumstances here, we conclude that there was a clear abuse of discretion in the failure to award attorney fees which more completely cover appellant's expenses, and we increase by $12,000 the final legal expense award, resulting in appellant's total recovery of about 60 per-

---

**4.** Appellant's needs during a period of education are an important consideration in examining the maintenance issue in this case. They are no less significant if she decides it is most reasonable to delay those plans for a number of years, having regard for the care needed by the children, the value of easy access of young children to their father, and the prospect for receiving the last of periodic payments which respondent must make in the next five years. In fact, the potential benefit in a delay, for the children and for both parties, is a significant factor supporting an appropriate maintenance award; the award provided in the judgment cannot be enjoyed unless appellant acts soon to pursue her education, and it leaves her in financial circumstances such that she must act without delay to do what she can to improve her earning capacity.

cent of her costs in the case through this appeal.

### DECISION

Rulings of the trial court on the physical custody of the children, on child support, on spousal maintenance and on payment of appellant's legal expenses, are reversed.

The judgment is affirmed on the division of marital property and the award of joint legal custody of the children.

The judgment is modified to place physical custody of both children with appellant, subject to respondent's reasonable visitation rights. Appellant's $5,000 judgment for her legal expenses is modified to $17,-000.

The matter is remanded for findings and conclusions of the trial court, consistent with this opinion, on the amount of child support and the amount of spousal maintenance.

Affirmed in part, modified in part, reversed in part, and remanded.