## STATE EX REL. RICHARD D. RYS v. ED VORLICEK AND ANOTHER.[1]

December 9, 1949.

No. 35,038.

*Edward J. Gavin,* for appellant.

*W. E. Reyerson,* for respondents.

[1]Reported in 40 N. W. (2d) 350.

KNUTSON, JUSTICE.

This is an appeal from an order of the district court of McLeod county in a proceeding for a writ of habeas corpus in which the custody of a minor child, Sylvia Rys, was awarded to respondents. The case has been considered here upon the testimony taken before a referee, to whom the matter was referred by us, and the testimony taken before the district court pursuant to a stipulation of the parties.

Relator, Richards Rys, and Lillian Dostal were married November 2, 1936. On July 22, 1938, an action for divorce was begun by relator. In his verified complaint, he stated that there was no issue of the marriage. The divorce decree was entered July 27, 1938. On November 27, 1938, Sylvia Rys, the subject of the present case, was born. No reference is made in the divorce decree to any issue of the marriage, nor was any effort ever made by either party to have the decree amended so as to show the birth of Sylvia.

From birth, Sylvia lived with her mother and was cared for and supported by her. The mother, Lillian, died August 29, 1948. The day after her mother's funeral, Sylvia was taken to live with respondents, Ed Vorlicek and Alice Vorlicek, his wife. Mrs. Vorlicek is the sister of Sylvia's mother. Letters of special guardianship were granted to Ed Vorlicek by the probate court of McLeod county upon the death of Sylvia's mother. Sylvia inherited, through her mother, 70 acres of land and some other property.

Relator remarried on February 11, 1941, and now lives in Hutchinson, Minnesota, where he is employed. A son was born to the second marriage on July 27, 1941. Relator is now 46 years old, and his present wife is 44 years old.

After the divorce of relator from Lillian, relator frequently visited his mother, who lived about a mile from the Dostal farm. Up until the time of the death of Sylvia's mother, relator had never gone to see Sylvia. The first time he ever made himself known to her was on the day of her mother's funeral. He never assumed any financial obligation for either the birth or the care or support of Sylvia. After Lillian's death, he called twice at the Vorlicek home, once on

April 30, 1949, and again on May 13, 1949. On the first occasion, he gave Sylvia fifty cents and a May basket, which were returned to him at the request of Mr. Vorlicek. On the second occasion, Sylvia ran and hid, so he did not get to see her.

The Vorliceks live on a farm five or six miles north of Silver Lake, Minnesota. They have a five-room modern home. Sylvia is well fed, clothed, and cared for. She helps with the farm chores at her own pleasure, beds down some calves, runs the tractor, works in the garden, and takes part in cooking and sewing in the house. She regularly attends Sunday school at the Presbyterian church in Silver Lake. She has been brought up in the Presbyterian church since she was born. Her school attendance is excellent. She has girl friends whom she visits, going on her bicycle. She testified that the Vorliceks were kind to her, that she liked living with them, and that she desired to remain with them. She further testified that she did not want to live with relator. The social service worker for the county welfare board of McLeod county testified that respondents' home was a good one for Sylvia. Several witnesses vouched for the character of the Vorliceks, including the minister of the church they attend.

On the other hand, relator lives in a good-sized modern home in Hutchinson. He is employed by the Kraft Cheese Company and earns approximately $200 per month. He and his wife have one son eight years old. He has no debts and owns an automobile. It appears that his second wife had some money which she contributed toward the purchase price of the house. Officers of the cheese company for which relator works testified that he is a good employe and is honest and dependable. Since his remarriage, relator has joined another church and now belongs to a different faith from that of Sylvia, her mother, and respondents. Other witnesses testified to the good character of relator, and so far as the record shows both relator and respondents are people of good character.

The applicable principles of law have been stated on many occasions and are so well stated in State ex rel. Olson v. Sorenson, 208

Minn. 226, 227, 293 N. W. 241, that they bear restating here. In that case we said:

"* * * All other things being equal, the natural parents have the paramount right to the care and custody of a child. State ex rel. Anderson v. Anderson, 89 Minn. 198, 94 N. W. 681; State ex rel. Lehman v. Martin, 95 Minn. 121, 103 N. W. 888; State ex rel. Renning v. Armstrong, 141 Minn. 47, 169 N. W. 249; State ex rel. Machgan v. Pelowski, 145 Minn. 383, 177 N. W. 627; State ex rel. Fossen v. Hitman, 164 Minn. 373, 205 N. W. 267; State ex rel. Feeley v. Williams, 176 Minn. 193, 222 N. W. 927. That right is not absolute, however, and must yield to the child's welfare. If its best interests will be served by granting custody to someone else that will be done. Gauthier v. Walter, 110 Minn. 103, 124 N. W. 634; State ex rel. Larson v. Halverson, 127 Minn. 387, 149 N. W. 664; State ex rel. Neib v. Krueger, 143 Minn. 149, 173 N. W. 414; State ex rel. Henning v. Gundvaldson, 169 Minn. 335, 211 N. W. 310; State ex rel. Lund v. Anderson, 175 Minn. 518, 221 N. W. 868; State ex rel. Feeley v. Williams, 176 Minn. 193, 222 N. W. 927.

"The presumption is that parents are fit and proper persons to have the care and custody of their child, and the burden is upon those who claim the contrary to overcome that presumption by satisfactory proof. State ex rel. Lehman v. Martin, 95 Minn. 121, 103 N. W. 888. Under appropriate conditions the child's wishes may be taken into consideration in determining the custody. State ex rel. Feeley v. Williams, 176 Minn. 193, 222 N. W. 927."

The paramount right of a parent to custody of a child is bottomed on the belief that parents will give to children much by way of love and affection that may be lacking where the blood relationship does not exist. This was recognized in State ex rel. Ashcroft v. Jensen, 214 Minn. 193, 195, 7 N. W. (2d) 393, 394, where we said:

"* * * Every court recognizes the deep and enduring affection which parents have for their children and their willingness to make sacrifices and endure hardships in their interests which a stranger would not consider. No court would deprive a parent of his child

simply because someone else might give it better care or attention than the means of the parent permit. The sanctity of the home and the maintenance of family life form the foundation of our society and are of paramount importance now as in the past."

In State ex rel. Herniman v. Markson, 187 Minn. 176, 179, 244 N. W. 687, 688, we said:

"* * * The law which gives a parent a natural and enforceable right to his child, and deprives him of it only when the best interests of the child demand, appreciates that the call of blood relationship is a promise of right treatment not to be disregarded."

See, Wilson v. Mitchell, 48 Colo. 454, 111 P. 21, 30 L.R.A. (N.S.) 507; 22 Minn. L. Rev. §99; 5 Fordham L. Rev. 460.

This case is distinguishable from those cases where a parent has temporarily been unable to provide for a child, and, as a result, its custody has been awarded to someone else. Here, over a period of more than ten years, although living in the same community, relator did not even make himself known to his ·child as her father. He made no effort to assume any financial obligation for her birth, care, or support. He did not so much as send her a Christmas present or any other kind of gift. He has offered absolutely no excuse for completely ignoring his child. So far as the child is concerned, the father is a complete stranger to her. By his past conduct, relator, for all intents and purposes, has completely abandoned his child. It would be idle for us to assume that mere blood relationship, which a parent has shown no disposition to manifest over these many years, may now be kindled into something akin to that love and affection which it is natural to suppose is inherent in all parents toward their children. Feelings that have remained dormant so long are small assurance that the parent can or will give to the.child that love and affection which we normally associate with parenthood and which someone else might not be able to give. Under these circumstances, we do not believe that it would serve the best interests of Sylvia now to remove her from surroundings with which she is familiar and in which she finds contentment and from relatives with whom

she desires to remain and transplant her in soil which is entirely foreign to her and place her with those who, in spite of blood ties, have shown no desire to recognize the relationship that has existed over all these years. Sylvia is now over 11 years of age. We are convinced that it would cause serious emotional and psychological disturbances to force her to change her place and mode of living at this time. The case is an exceptional one. The parent alone, by his complete neglect of his child, is responsible for creating a situation in which the welfare of the child prohibits the application of the general rule. We are convinced that the trial court has come to the correct conclusion, and its disposition of the case is adopted by us and is affirmed.

Affirmed.