255 Minn. 165 (1959)
95 N.W. (2d) 643
IN RE PETITION OF LEONARD HOHMANN FOR WRIT OF HABEAS CORPUS.
LEONARD HOHMANN
v.
HERBERT WALCH.
No. 37,727.
Supreme Court of Minnesota.
April 3, 1959.
*166 Sawyer, Sawyer & Darby, for appellant.
Streater & Murphy, for respondent.
MATSON, JUSTICE.
Pursuant to a writ of habeas corpus issued upon the relation of the surviving parent, Leonard Hohmann, the district court ordered judgment awarding relator the custody of his two children, Daniel Hohmann, aged 15, and Judith Hohmann, aged 13, who, upon the death of their mother, remained in the possession of their stepfather, the appellant herein.
Upon appeal from the judgment, this court appointed a referee to take testimony. Pursuant to stipulation of the parties, this court, in making its de novo determination, has considered not only the transcript of the testimony presented to the referee but also the transcript of the testimony given before the district court in the original trial.
Leonard Hohmann and Priscilla Nelson were married about 1939. Daniel Hohmann was born in 1943; Judith in 1945. Leonard and Priscilla were divorced in 1949. Upon stipulation of the parties, custody of the two children was given to Priscilla, subject to reasonable visitation by Leonard, and Leonard was to pay $40 per month for the children's *167 support.
Priscilla married Herbert Walch, appellant, in 1950. One child  a daughter now 7 years old  was born to this marriage. Priscilla and Herbert lived on a 305-acre farm near Altura, Minnesota, owned by Priscilla's parents. The dwelling thereon is a large, modern four-bedroom house. Priscilla, the natural mother of the children here involved, died on August 4, 1958, at the age of 38. Twenty-four days later, on August 28, 1958, Leonard procured this writ of habeas corpus to obtain custody of his children.
Leonard had himself remarried in 1951, and now lives in a modern three-bedroom home (with plans for an additional bedroom) in the city of Winona. He earns $5,000 per year as a lock and dam operator. It is clear from the evidence that Leonard's new home, with his wife Virginia, is a happy one. One child  a daughter now 6 years old  has also been born to this marriage.
Appellant has an income of $3,500 from his farm-sharing arrangement with Priscilla's parents. It is clear from the evidence that the children are happy in the Walch home. Both Daniel, aged 15, and Judith, aged 13, have expressed a desire to remain with Herbert Walch, appellant, whom they call "Dad." They both expressed an attachment to the farm. This attachment is strongest in Daniel's case since he hopes to be a farmer and believes his maternal grandparents will turn over the farm to him. Both children are apprehensive about making the adjustments necessary in entering a new home and a new family relationship. They left their real father's home when they were 6 and 4 years old, respectively. Two of Judith's reasons for wanting to stay on the farm were that she didn't know what she would do with all her spare time in the city, and that her stepfather had promised her that he would provide an education for her. Judith has expressed a desire to be a first grade teacher. Relator's wife, Virginia, is a college graduate and has taught home economics for six years. Judith expressed the unusual feeling that their father was seeking their custody only because "he just wants to be mean" and Daniel felt that his real father had no affection for him.
After careful consideration we conclude that the children's expressed desires to remain with their stepfather are based not only on the favorable personal experience they have enjoyed under his kindly care but *168 also on their fear of the unknown, a fear stemming from the fact that they have had no opportunity to really know their father or stepmother. The fear of going to their father is also a product of the influence of their maternal grandparents. It is obvious, as the trial court originally found, that their thoughts and desires have been wrongfully influenced by these grandparents. When we say wrongfully influenced, we say it not in a spirit of condemnation but with a realization that it is not unusual for grandparents to look with disfavor upon the divorced husband of their daughter.
Since Priscilla's death in August 1958, her mother, aged 60, has been going to the farm early every day to cook meals and help take care of the children and the farm. She testified that she and her husband are willing to move to the farm.
1-2. A provision of a divorce decree awarding custody of a minor child to one of the parents determines only that the welfare of the child, under the circumstances then existing, will best be served, while both parents are living, by suspending the custodial rights of one parent and placing the child into the custody of the other. As an adjudication of custodial rights a divorce decree is conditioned upon the continued life of both parents, and when the custodial parent dies, the decree eo instante ceases to be operative and the custodial rights of the surviving parent are reinstated as if no decree of divorce had ever been entered.[1] It follows, and this is in accord with the majority rule[2] which is adhered to in this jurisdiction, that upon the death of the parent who has held custody of a minor child under a divorce decree the right to custody automatically inures to the surviving natural parent unless it be shown in an appropriate proceeding (1) that he is unfit,[3] (2) that he has *169 forfeited his custodial right as by abandonment,[4] or (3) that irrespective of his fitness, exceptional circumstances indicate that the best interests of the child clearly require that the surviving parent be denied custody.[5] Although the right of a parent to the care and custody of his minor child is paramount and superior to the right of a third person, that right must always yield to the best interest of the child.[6]
3-4. Here no issue arises as to the fitness of the surviving father since the record demonstrates that he is a proper and suitable person to have the custody of his children. Even though his fitness is not open to challenge, the question, nevertheless, remains whether, in the light of all the other surrounding circumstances, the best welfare of his children demands that their present status be continued and his right to custody be denied. Although the custodial right of a surviving parent whose fitness is established is not to be lightly disregarded, such parent, despite his fitness, may be denied custody if under all the surrounding circumstances it appears that it would be clearly inimical to the best welfare of the children to uproot them from a long-established and beneficent custodial environment to which they have become adjusted.[7] Furthermore, where children of sufficient maturity to express an intelligent opinion have a factual basis for passing judgment on their surviving father's parental attitude, and have not been wrongfully influenced by others, their definitely expressed desire not to be transferred to the custody of their father is entitled to considerable weight in determining *170 whether it is wise to uproot them from their present custodial home.
5. In determining whether the best interests of a child justify depriving a surviving parent of his custodial right, the law recognizes that the call of blood relationship is normally a promise of right treatment which is not to be disregarded. State ex rel. Herniman v. Markson, 187 Minn. 176, 179, 244 N.W. 687, 688; State ex rel. Rys v. Vorlicek, 229 Minn. 497, 501, 40 N.W. (2d) 350, 352. The weight to be given to the promise of future right treatment arising out of the blood relationship of parent and child varies according to the surviving parent's past record of fidelity in meeting his parental obligations. The custodial right of one who has shown little parental affection for his child and who has voluntarily left its care to others is weak since there is little promise of future fidelity.
In State ex rel. Rys v. Vorlicek, supra, we gave little weight to the custodial right of a father who for 10 years, without excuse, had ignored his child and had not assumed any financial obligation for her birth, care, and support. In that case we respected the wishes of his 11-year-old daughter to remain in the wholesome atmosphere of a third-party home to which she had become happily adjusted.
In State ex rel. Feeley v. Williams, 176 Minn. 193, 222 N.W. 927, we denied the surviving father's right to custody and respected the well-expressed desire of his 12 1/2-year-old daughter to remain in her aunt's home. In that case the father's custodial right was weak since he had theretofore manifested no affection for his child and had, without justification, permitted his daughter to be supported and educated by the aunt and her relatives for 4 years without any contribution on his part.
In State ex rel. Neib v. Krueger, 143 Minn. 149, 173 N.W. 414, the desire of a 14-year-old son to remain in the home of his grandmother, who had given him a good home for 14 years with very little contribution from his father, was respected by the court as a significant evidentiary factor in finding that the boy's welfare required a denial of his father's custodial right.
In Gauthier v. Walter, 110 Minn. 103, 124 N.W. 634, a father's custodial right of his 15-year-old son was denied. The son had expressed a definite desire to remain in a third-party home where he had happily *171 lived for 13 years. The father occasionally visited the son and the son had on a few occasions visited his father in another city and was therefore well acquainted with his father's attitude. Also it is significant that the father had been awarded the custody of his son under a divorce decree entered 7 or 8 years earlier but had voluntarily left his son to the care of others. Here again we have a case where the father's past record gave a questionable promise of fidelity for the future right treatment of his son.
In the present case the father's conduct, ever since he was divorced from the children's mother, has been one of fidelity, and that conduct impliedly carried with it a strong promise of future parental devotion and dedication to the welfare of his children. He has faithfully complied with the divorce decree by regularly paying $40 monthly for the children's support. Admittedly during the 8 1/2 years from 1949 to 1958 he visited the children infrequently and no more than twice in any one year. This, however, is readily understandable because under the circumstances existing in the Walch home, and with the grandparents usually there, he didn't feel welcome. He has given convincing testimony that he wanted to see the children more often than he did. He is not to be condemned for having given way to his feeling that his children would be upset and would not benefit from his visits in such tense and touchy surroundings. The happy home life he has provided for the daughter by his second marriage attests to his kindly and affectionate attitude toward children. There can be little doubt that Daniel and Judith will enjoy devotion and kindness when they enter the home of their father.[8]
Only by giving custody to the father and his wife, Virginia, will the children, and especially 13-year-old Judith in her important formative years of young womanhood, have the assured presence and guidance of a mother. To finish the picture, their stepfather is now a widower, with only his deceased wife's parents to assist him. He does not own the farm upon which he lives and works, nor does he even have an enforceable right to stay thereon. The children will have to make major adjustments *172 by moving to their natural father's home, but their adjustments will be almost as major if they remain with their widowed stepfather if he remarries, and this is true whether he stays on, or leaves the farm. When we consider all the circumstances, we cannot deny the father the custody of the children on the theory that it will be clearly inimical to their best interest to transfer them from their present farm home and surroundings.
We are not unmindful of the expressed wishes of the children or of the potential harm of subjecting them to an unwanted discipline. In declining to give controlling weight to their desire to remain with their stepfather, we have taken into consideration the fact that they have not had an opportunity to know their father and the further fact that their expression of choice reflects, in part, the influence of others rather than their own judgment.
In giving recognition to the right of the natural father to have the custody of his children, and that the welfare of the children will best be served by having them live with him, we have not overlooked the exemplary role which their stepfather, Herbert Walch, has played in treating them with parental kindness and understanding as if they were his own children. Herbert Walch deserves the respect and gratitude of all parties to this proceeding. The custodial issue has been a close one and affects the personal lives of several interested and affectionate individuals. There would seem to be no valid reason, however, why these children should not continue in an amiable relation with Herbert Walch and their maternal grandparents, the Nelsons. It may reasonably be assumed that their grandfather and their father will cooperate so that Daniel may realize his ambitions to become a successful farmer. The children should realize that this has not been a selfish dispute between their natural father and their stepfather but has rather been an attempt by both parties to secure their maximum comfort and happiness.
Let judgment be entered awarding custody of the children to relator, Leonard Hohmann.
NOTES
[1] State ex rel. Gravelle v. Rensch, 230 Minn. 160, 40 N.W. (2d) 881; Kienlen v. Kienlen, 227 Minn. 137, 34 N.W. (2d) 351; Clarke v. Lyon, 82 Neb. 625, 118 N.W. 472, 20 L.R.A. (N.S.) 171.
[2] Annotation, 39 A.L.R. (2d) 258; 17A Am. Jur., Divorce and Separation, § 834.
[3] Kienlen v. Kienlen, supra. As to burden of proof in establishing surviving parent's unfitness, see State ex rel. Lehman v. Martin, 95 Minn. 121, 103 N.W. 888; State ex rel. Rys v. Vorlicek, 229 Minn. 497, 500, 40 N.W. (2d) 350, 351.
[4] Moss v. Vest, 74 Idaho 328, 262 P. (2d) 116; 17A Am. Jur., Divorce and Separation, § 821; see, State ex rel. Rys v. Vorlicek, 229 Minn. 497, 501, 40 N.W. (2d) 350, 352.
[5] State ex rel. Gravelle v. Rensch, 230 Minn. 160, 166, 40 N.W. (2d) 881, 884; State ex rel. Herniman v. Markson, 187 Minn. 176, 244 N.W. 687; State ex rel. Merritt v. Eldred, 225 Minn. 72, 29 N.W. (2d) 479; see, 38 Minn. L. Rev. 623, 630.
[6] State ex rel. Herniman v. Markson, supra; State ex rel. Neib v. Krueger, 143 Minn. 149, 173 N.W. 414; Gauthier v. Walter, 110 Minn. 103, 124 N.W. 634; State ex rel. Lehman v. Martin, 95 Minn. 121, 103 N.W. 888; State ex rel. Renning v. Armstrong, 141 Minn. 47, 169 N.W. 249; State ex rel. Machgan v. Pelowski, 145 Minn. 383, 177 N.W. 627; see, State ex rel. Nelson v. Whaley, 246 Minn. 535, 75 N.W. (2d) 786.
[7] See, 38 Minn. L. Rev. 623, 630.
[8] We have not overlooked the accusation that prior to the divorce he had struck the children on the head but reject it as palpably untrue in the light of the abortive effort to substantiate it by medical testimony of no probative value.