**In the Matter of the CUSTODY OF N.A.K., DOB 4/10/92.**

**Christopher Rodgers, et al., Petitioners, Respondents,**

**v.**

**Robert J. Knauff, Petitioner, Appellant.**

**Nos. C3–01–170, C6–01–678.**

Supreme Court of Minnesota.

Aug. 15, 2002.

Mark A. Olson, Burnsville, for Appellant.

Gary A. Debele, Walling & Berg, P.A., Minneapolis, for Respondents.

John Remington Graham, Quebec, Canada, for Amicus Curiae R–KIDS of Minnesota.

Laurie Hanson, Legal Aid Society of Minneapolis, John M. Jerabek, Minneapolis, for Amicus Curiae Minnesota Kinship Caregivers Association.

Gail Chang Bohr, Children's Law Center of Minnesota, St. Paul, Lisa Pritchard Bayley, Minneapolis, for Amicus Curiae Children's Law Center.

## OPINION

BLATZ, Chief Justice.

Appellant Robert Knauff appeals an order awarding custody of his daughter N.A.K. to his deceased ex-wife's sister and brother-in-law. He argues that the custody order was based on findings unsupported by the record, that the court misapplied the law, and that the order violated his constitutional right to the care, custody and control of his child. The court of appeals affirmed the custody order. We reverse and remand the matter to the district court for further proceedings consistent with this opinion.

N.A.K. was born to appellant Robert Knauff and the now-deceased Renee Montpetit on April 10, 1992. Upon their divorce in 1994, Knauff and Montpetit were awarded joint legal custody of N.A.K. and Montpetit was awarded sole physical custody. Knauff and Montpetit clashed over financial and access issues, and Montpetit obtained orders for protection against Knauff in Ramsey County. Between 1995 and 1999 Knauff lived in Wisconsin, Ohio, and California, and in 1996 the district court ordered that Knauff's access with N.A.K. be supervised. However, Knauff testified that he never knew of this order and that he cared for N.A.K. at his mother's home during this time.

In late 1996, Montpetit was diagnosed with a serious heart ailment that resulted in hospitalizations and ultimately a heart transplant. During that time Montpetit's family, including her sister Robin Rodgers

and Robin's husband Chris Rodgers (the Rodgers), stepped in to help care for Montpetit, N.A.K., and Montpetit's teenage son from another relationship, Nathan. In March 1998 Montpetit was admitted to a hospital in Rochester, and Montpetit and the Rodgers decided that N.A.K. would live with the Rodgers while Montpetit was in the hospital awaiting a heart transplant.

In June 1998 Montpetit executed a will that stated her wishes as to N.A.K.:

> With regard to my minor child [N.A.K.], it is my sincere and firm belief that the natural father Robert J. Knauff is not a fit and proper person to have legal or physical custody. Under no conditions do I want Robert J. Knauff to be the testamentary guardian or conservator of the person or estate of my minor child [N.A.K.], nor do I want Robert J. Knauff to be the custodian, under the Uniform Transfers to Minors Act, of my minor child [N.A.K.]. ·I am stating my wishes in this regard out of love and concern for [N.A.K.]'s safety and welfare, and in consideration of her best interests, and therefore nominate as testamentary guardian and conservator of the person and estate of [N.A.K.] in the order of priority listed below:
>
> * * * My sister Robin M. Rodgers.
>
> * * * My sister JoyLynn Graf.

In July 1998 Montpetit moved back to the Twin Cities and N.A.K. and her older son Nathan moved back in with her while Montpetit waited to have a heart transplant, which occurred in November 1998. After the transplant, Montpetit remained hospitalized and later became an outpatient in Rochester until the end of February 1999. N.A.K. stayed with the Rodgers during this time; on the weekends members of Montpetit's family would bring N.A.K. to see Montpetit in Rochester.

During March of 1999 Montpetit's family began to notice that Montpetit's moods were volatile. After witnessing Montpetit's erratic behavior, Robin Rodgers contacted the Mayo Clinic. Montpetit received psychiatric treatment at the Mayo Clinic in April 1999 and a psychiatrist diagnosed her with "[p]robable drug induced mania versus bipolar affective disorder." The Mayo Clinic records also contain a letter from Montpetit's cardiologist that states Montpetit had shown evidence of hypomanic behavior at a clinic appointment. On May 12, 1999, the Mayo Clinic sent mental health evaluators to visit Montpetit at her home. Montpetit was very upset by this and blamed her family members, believing that they were trying to have her committed and gain custody of N.A.K. Montpetit took N.A.K. from the Rodgers' home in May 1999 and had N.A.K. live with her.

On June 4, 1999, Montpetit executed another will, which was probated in Ramsey County District Court after Montpetit's death.[1] The second will stated:

> With regard to my minor child [N.A.K.], if the natural father Robert J. Knauff predeceases me, or otherwise is unable or fails to act as guardian, I nominate [my son Nathan's father] as the legal guardian of the person and estate of my minor child [N.A.K.].

In late June 1999, Montpetit took N.A.K. to California for a three-week visit, during which they stayed with Knauff. They returned to Minnesota after two weeks—one week earlier than planned.

Almost immediately thereafter Montpetit became ill, fell into a coma, and died on July 15, 1999. Knauff did not attend the

---

**1.** We grant the Rodgers' motion to strike portions of Knauff's brief referring to probate proceedings as outside the record under Minn. R. Civ.App. P. 110.01.

funeral or make contact with N.A.K. at this time. Knauff testified that he was unaware of Montpetit's death and did not know N.A.K.'s whereabouts.[2] Because of the alleged difficulty in ascertaining N.A.K.'s whereabouts, he hired a private investigator to assist him in finding her. On July 24, 1999, Knauff and the private detective flew to Minnesota to pick N.A.K. up. Accompanied by police they arrived at the Rodgers' home at approximately 2:00 a.m. After the Rodgers showed the police a copy of the 1996 supervised visitation order, the police decided to leave N.A.K. in the custody of the Rodgers.

The next day the Rodgers executed nearly 30 pages of affidavits alleging among other things that Knauff had bipolar affective disorder, had a drug and alcohol problem, had not held a steady job, and had not visited with N.A.K. after the 1996 order except for the California visit before Montpetit's death.

On July 26, the Rodgers filed a petition for custody of N.A.K., alleging that Knauff had willfully neglected to provide for N.A.K. and that N.A.K. had resided with the Rodgers for the majority of the previous three years. The Rodgers also filed a motion for an ex parte order granting them immediate temporary custody of N.A.K. The court issued the ex parte order, stating that the Rodgers had demonstrated that N.A.K. "has resided with them for a period of twelve months or more," and that Knauff "has had no contact with the child on a regular basis and has not demonstrated consistent participation in the child's well-being for more than six months" and "has refused or neglected to comply with the duties imposed upon him by the parent and child relationship" and the divorce decree.

Following the issuance of the ex parte order, the district court held a temporary custody hearing and on October 4, 1999, the district court granted the Rodgers temporary sole legal and sole physical custody of N.A.K., but allowed for access between Knauff and N.A.K. Because the court did not believe the case presented a "close call," it rejected Knauff's argument that a presumption favoring parents creates an "uneven playing field" favoring parents over third parties in close cases.

In preparation for the permanent custody hearing, the court then appointed a guardian ad litem for N.A.K. and directed the parties to cooperate with the Hennepin County Department of Court Services in completing a custody evaluation. Several evaluations were conducted by various professionals and the following reports were submitted to the court: a custody and visitation evaluation report prepared by Family Court Evaluator Nancy Darcy; a chemical dependency evaluation of Knauff prepared by Steven T. Johnson; and psychological evaluations of Christopher Rodgers, Robin Rodgers, and Robert Knauff, prepared by Paul H. Boerger, Ph.D. In addition, Nancy Darcy referred N.A.K. to Hennepin County psychologist Susan De Vries for an evaluation to obtain information on N.A.K.'s emotional health, her adjustment to her mother's death, and her attachment to Knauff and the Rodgers. De Vries recommended that N.A.K. begin individual therapy. Based upon that recommendation, the Rodgers selected Leslie Faricy as N.A.K.'s therapist. In turn, while N.A.K. was visiting Knauff in

---

2. With respect to Knauff's explanation of his lack of involvement with N.A.K. at the time of Montpetit's death, the district court found that Knauff "totally lacked credibility when he attempted to explain his alleged difficulty in locating [N.A.K.] after [Montpetit's] death, as well as his difficulty in finding out details regarding [Montpetit's] declining health and funeral arrangements."

California in April 2000, Knauff brought N.A.K. to a therapist, Robin Walker, who issued a letter indicating that N.A.K. wished to live with her father. This letter from Walker, as well as Dr. Faricy's report and deposition testimony, were received by the court.

The custody trial began on August 1, 2000. The Rodgers, the guardian ad litem, and several experts provided both testimonial and documentary evidence suggesting that Knauff inappropriately involved N.A.K. in the custody proceedings. Knauff testified that the Rodgers had repeatedly denied him access to N.A.K., that his phone contact with N.A.K. was interfered with, and that his role as N.A.K.'s father was not being incorporated into decisions made for and about N.A.K. Knauff also alleged that N.A.K.'s guardian ad litem carried a significant bias against him during this time and was aligned with the Rodgers' counsel in another matter. The guardian denied any bias and testified at trial that Knauff's behavior was the root of any differences between them.[3]

On August 21, 2000, the district court granted the Rodgers permanent sole legal and physical custody of N.A.K. In doing so, the court made specific findings that corresponded with the factors a court is to consider in determining the best interests of a child, set forth in Minn.Stat. §§ 518.17

and 257.025 (2000), from the "Marriage Dissolution" and "Children; Custody, Legitimacy" chapters, respectively.[4] The "best interests factors" in the statutes include the wishes of the parties or parents; the custodial preference of the child; the child's primary caretaker; the intimacy of the relationships between the parties and the child; relationships and interactions with siblings and significant others; the child's adjustment to home, school, and community; stability and continuity; permanence of the proposed custodial home; the mental and physical health of all individuals involved; and the capacity and disposition of the parties to give love and guidance. As a prelude to its application of the best interests factors to the evidence before it, the district court stated:

> Unfortunately or fortunately, depending upon one's perspective, Minnesota trial courts are not permitted to advance a core belief that biological parents should be entitled to custody of their children vis a vis non-biological parents. Instead, trial courts must apply the best interests factors, and when that is done herein, [the Rodgers'] case is an overwhelming one because the vast majority of the best interests factors strongly favor [the Rodgers.]"

In its order and memorandum, the district court found specifically:

---

**3.** The district court later denied Knauff's motion to remove the guardian ad litem, stating that "[a]fter observing [the guardian] in chambers and in court and after reading her written submissions, the Court came away with the distinct impression that, on an overall basis, [the guardian] did an admirable job on [N.A.K.'s] behalf."

We deny the Rodgers' motion to supplement the record with a report from the guardian ad litem program responding to a complaint Knauff made alleging N.A.K.'s guardian was biased against him. The report is outside the record under Minn. R. Civ.App. P. 110.01

**4.** The best interests factors of Minn.Stat. § 518.17 and Minn.Stat. § 257.025 contain only two minor differences. First, section 518.17 includes as a factor the wishes of the parents, and section 257.025 includes as a factor the wishes of the parties. Second, section 518.17 includes as a factor "except in cases in which a finding of domestic abuse * * * has been made, the disposition of each parent to encourage and permit frequent and continuing contact by the other parent with the child." Section 257.025 lacks a comparable factor.

(1) it did not "have faith in the integrity of [Montpetit's] dying wish" as to custody because the evidence "quite clearly depicts * * * a confused and unstable person";

(2) that it could not determine N.A.K.'s preference because the guardian ad litem would not consent to an interview,[5] but that N.A.K. had expressed conflicting wishes depending on to whom she was talking;

(3) that the Rodgers were N.A.K.'s primary caretakers;

(4) that "[Knauff] has been able to maintain a warm loving relationship with [N.A.K.] despite being out of the state for most of the last four years" and that N.A.K. also has a "very intimate relationship" with Robin Rodgers;

(5) that Chris Rodgers has a strong relationship with N.A.K. and that N.A.K. has a "significant, strong relationship with her half-brother Nathan." In addition, while N.A.K. has strong relationships with relatives of both her mother and father, "[o]n balance, the interaction and inter-relationships with [the Rodgers'] relatives and significant others has been far more important and extensive than with [Knauff's] relatives and significant others";

(6) that "[a]lthough [N.A.K.] has struggled in school, she has made steady improvement in the parochial school chosen by the [Rodgers]," and has numerous close friends in the school and community;

(7) that the Rodgers provided a more stable environment than Knauff and that, according to N.A.K.'s therapist, "[b]ecause of the upheaval in her life, [N.A.K.] is in need of greater security, continuity and structure than most children of her age";

(8) that the Rodgers offer a very permanent home in terms of physical environment and personal relationships while Knauff had "little to offer of a permanent nature";

(9) that Robin Rodgers is physically and mentally fit in all respects, that Chris Rodgers is not mentally or physically deficient in any way that could negatively impact N.A.K., and that "significant credible evidence established that [Knauff] does not have a proper understanding of child development," including evidence that Knauff inappropriately used N.A.K. as a tool in his pursuit of custody;

(10) that the court had concerns regarding Knauff's ability to provide "much needed guidance in the years ahead";

(11) that "the Court did not come away with the feeling that [Knauff] has the capacity or disposition to exceed Petitioner Robin Rodgers" in terms of providing N.A.K. with love and affection, and that "without hesitation" the Rodgers have "a far greater disposition and capacity to continue raising [N.A.K.] in her current religion"; and

(12) that because of a lack of communication and cooperation, joint custody was not a viable option.

After making its detailed findings of fact, the district court concluded:

> This Court is troubled with the prospect of permanently depriving a biological parent of the custody of his child when he is neither unfit nor has a history of abandoning that child (now that the biological, custodial mother has passed on). However, the legislature and higher courts have spoken and they

<hr/>

5. The district court noted that the guardian ad litem would not waive her right to be present at an in camera interview of N.A.K., citing Minn.Stat. § 518.166 (2000), and that the guardian further argued that any inter- view was not in N.A.K.'s best interest. The court stated that without the guardian's waiver, the court could not and would not engage in an in camera review.

have crafted a best interests test. When that test is applied to the particular facts herein, the result is clear. So many of the best interests factors favor the [Rodgers], some convincingly, that this Court could not award custody to [Knauff] without abusing its discretion.

After issuing its permanent custody order, the district court issued an access schedule providing that Knauff's access would increase over time if he complied with several requirements. The requirements included participating in a twelve-step program, maintaining documentary evidence of at least weekly attendance and contact with a 12-step sponsor every week, commencing a parenting class that would include child development and grief issues, and meeting with the child's therapist during the first month after the order was issued and then following her recommendations for developing parenting strategies to address N.A.K.'s needs.

Knauff did not fulfill any of the requirements of the access schedule order and filed pro se post-trial motions for a new trial and amended findings. In these motions Knauff raised a constitutional challenge to the decision based on his fundamental right as a parent to the care and custody of N.A.K., arguing that the application of the best interests factors of section 257.025, the "Custody Disputes" stat-ute, are unconstitutional as applied to a fit parent. In support of his argument, Knauff cited *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality decision).[6] The court ruled that Knauff's post-trial motions were untimely and that Knauff failed to give notice to the Attorney General that he was challenging the constitutionality of a statute. The court further concluded that because Knauff failed to articulate this interpretation of *Troxel* at trial he was barred from raising a new legal theory after trial, and that even if the motion was timely, *Troxel* did not apply to the case at hand.

Knauff then appealed the district court's denial of his pro se motion to the court of appeals and went to the media with his story. In turn, the Rodgers and the guardian ad litem moved to have Knauff's access restricted. In February 2001, the district court ordered that until Knauff complied with the order, his access would be supervised but that telephone contact with N.A.K. would be allowed. The court also awarded attorney fees to the Rodgers and revisited the gravamen of Knauff's post-trial motion under Minn. R. Civ. P. 60.02,[7] which was that the court had applied the wrong standard in determining custody of N.A.K. Knauff argued that the court had "applied a 'simple weight of the evidence' standard to determine that 'the

---

**6.** In *Troxel,* the Court addressed a Washington statute that provided that any person may petition the court for visitation at any time, and that the court may order visitation rights for any person when visitation may serve the best interests of the child. 530 U.S. at 61, 120 S.Ct. 2054. The Court in a plurality decision held that the statute violated the substantive due process rights of the mother as applied to permit paternal grandparents to obtain increased court-ordered visitation following the death of the children's father-visitation in excess of what the mother thought appropriate. *Id.* at 72–73, 120 S.Ct. 2054. The district court's order was based solely on the court's disagreement with the mother as to whether children would benefit from such increased visitation. *Id.* at 68–70, 120 S.Ct. 2054. The Supreme Court's holding was based in part on the fundamental right of parents to make decisions concerning the care, custody, and control of their children. *Id.* at 65–66, 120 S.Ct. 2054.

**7.** Minn. R. Civ. P. 60.02 provides that a court may set aside a judgment if the moving party establishes that mistake, inadvertence, surprise, excusable neglect, newly discovered evidence, fraud, or any other reason justifies relief from the judgment.

best interests of the child * * * would be "better" served' by [the Rodgers] and by doing so, ignored the presumption that [N.A.K.'s] best interests would be served by reposing custody in [Knauff], her natural father." The court rejected this argument outright, quoting from its permanent custody order and elaborating on its ruling:

This argument misunderstands the Court's August 2000 decision. Therein the Court acknowledged that, "Caselaw has made it clear that ... the custody inquiry ... [starts] with a preference or presumption in favor of the surviving biological parent." * * * The Court did not ignore this presumption, apply "a simple weight of the evidence test," and decide, based on a simple preponderance of the evidence, that [N.A.K.'s] best interests would be better served by placing her with [the Rodgers]. Instead, the Court found that "[the Rodgers'] case is an overwhelming one because the vast majority of the best interests factors strongly favor [the Rodgers]." * * * The Court even explained that it was "troubled with the prospect of permanently depriving a biological father of the custody of his child when he is neither unfit nor has a history of abandoning the child," but despite the Court's own personal distaste for the task, the Court found that the need to award custody to [the Rodgers] was "clear." It also found that, "So many of the best interest factors favor [the Rodgers], some convincingly, that this Court could not award custody to [Knauff] without abusing its discretion." In other words, the Court ruled in [the Rodgers'] favor not because they established their case by a simple preponderance of the evidence, or because this * * * Court believed [N.A.K.'s] best interests would be better served with the [Rodgers]. Instead, the Court ruled in the [Rodgers']

favor because they provided a clear and convincing case, indeed an "overwhelming" case.

(Citations omitted.) The court further rejected Knauff's suggestion that the court must find that a parent is unfit or has abandoned the child in order to award custody to a third party. Instead, the court recognized that "some other 'extraordinary circumstances' may provide the 'grave reasons' for denying custody to the surviving natural parent." Finally, the court also ordered that all parties restrict N.A.K.'s access to the media.

Knauff appealed from the aspect of the order granting attorney fees, and the appeals were consolidated for review. At the court of appeals Knauff argued that the district court's findings of fact were unsupported by the record, that it misapplied the law regarding the attorney fees, and that the best interests factors set forth in Minn.Stat. §§ 257.025 and 518.17 violate due process as applied to custody disputes between a parent and a third party because the statutes do not adequately protect the right of the parent to raise the child.

On December 11, 2001, the court of appeals affirmed the district court's decision. The court of appeals concluded that the district court's findings were supported by the record, and that the court did not abuse its discretion in its custody determination or in awarding attorney fees to the Rodgers. Regarding Knauff's constitutional argument, the court of appeals held that because the district court denied Knauff's post-trial motion on procedural grounds, it was not required to consider Knauff's constitutional challenge. Because Knauff made no claim on appeal that the procedural basis for denial was erroneous, the court of appeals concluded that the constitutional challenge was not properly

before the court. We granted Knauff's petition for review.

District courts have broad discretion to determine matters of custody. *Durkin v. Hinich,* 442 N.W.2d 148, 151 (Minn.1989). Appellate review of custody determinations is limited to whether the district court abused its discretion by making findings unsupported by the evidence or by improperly applying the law. *Pikula v. Pikula,* 374 N.W.2d 705, 710 (Minn. 1985). When determining whether findings are clearly erroneous, an appellate court views the record in the light most favorable to the trial court's findings. *Rogers v. Moore,* 603 N.W.2d 650, 656 (Minn.1999) (citation omitted). As a general matter, appellate courts review questions of law de novo. *Frost Benco Electric Ass'n v. Minnesota Pub Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.1984).

We first examine Knauff's argument that the district court failed to properly incorporate into its analysis a fundamental principle of Minnesota case law, that in custody disputes, a fit parent must be given a superior right to his child over a third party. Knauff essentially argues that the district court here simply placed the parties on a level playing field and awarded custody to the Rodgers because they prevailed on a preponderance of the best interests factors.

We have stated that in a custody dispute between a parent and a third party, two basic doctrines control the decision, with one dominating the other:

> The first of these doctrines stands for the proposition that a mother is entitled to the custody of her children unless it clearly appears that she is unfit or has abandoned her right to custody, *or unless there are some extraordinary circumstances which would require that she be deprived of custody.* The second doctrine is the so-called best-interest-of-the-child concept, according to which the welfare and interest of the child is the primary test to be applied in awarding custody.
>
> * * * *
>
> The principle that the custody of young children is ordinarily best vested in the mother, vital and established as it may be, is distinctly subordinate to the controlling principle that the overriding consideration in custody proceedings is the child's welfare.

*Wallin v. Wallin,* 290 Minn. 261, 264–65, 187 N.W.2d 627, 629–30 (1971) (emphasis added).[8] In *Durkin v. Hinich,* 442 N.W.2d 148, 153 (Minn.1989), we reiterated these principles, stating that the presumption in favor of a parent may be overturned if there are "grave and weighty" reasons to separate a child from his or her natural parent:

> "This court has repeatedly held that the right of a parent to custody of their child is paramount and either parent is presumed to be a fit and suitable person to be entrusted with care of child or children born to and belonging to them. The burden of disproving this presumption rests upon those who challenge it."

*Durkin,* 442 N.W.2d at 152–53 (quoting *In re Klugman,* 256 Minn. 113, 97 N.W.2d 425, 428–29 (1959)). The court went on to identify ways in which the parental presumption could be overcome:

> The natural parent is entitled, as a matter of law, to custody of a minor child unless "there has been established on the [parent's] part neglect, abandonment, incapacity, moral delinquency, instability of character or inability to fur-

---

8. *Wallin* involved a mother's right to custody of her daughter as opposed to a third party. The custody rights of the father were not at issue.

nish the child with needed care, * * * or unless it has been established that such custody otherwise would not be in the best interest of the child." *Wallin*, 290 Minn. at 266, 187 N.W.2d at 630. Although the presumption favors appellant, it may be overturned if there are "grave and weighty" reasons to separate a child from his or her natural parents. *Id.*

*Durkin*, 442 N.W.2d at 152–53.

Further, in *In Re Hohmann*, 255 Minn. 165, 95 N.W.2d 643 (1959), we expressed the rule of law that operates for a custody dispute occurring after a custodial parent dies.

A provision of a divorce decree awarding custody of a minor child to one of the parents determines only that the welfare of the child, *under the circumstances then existing*, will best be served, *while both parents are living*, by suspending the custodial rights of one parent and placing the child into the custody of another. As an adjudication of custodial rights a divorce decree is conditioned upon the continued life of both parents, and when the custodial parent dies, the decree eo instante ceases to be operative and the custodial rights of the surviving parent are reinstated as if no decree of divorce had ever been entered. It follows, and this is in accord with the majority rule which is adhered to in this jurisdiction, that upon the death of the parent who has held custody of a minor child under a divorce decree the right to custody automatically inures to the surviving natural parent unless it be shown in an appropriate proceeding (1) that he is unfit, (2) that he has forfeited his custodial right as by abandonment, or (3) that irrespective of his fitness, exceptional circumstances indicate that the best interests of the child clearly require that the surviving parent be denied cus-

tody. Although the right of a parent to the care and custody of his minor child is paramount and superior to the right of a third person, that right must always yield to the best interest of the child.

*Id.* at 168–69, 95 N.W.2d at 646–47 (emphasis in original; footnotes omitted).

*Hohmann's* language sets forth the rule later articulated in *Wallin*, providing that "exceptional circumstances" can overcome the superior custody rights of a parent. *Hohmann*, 255 Minn. at 169, 95 N.W.2d at 647. Furthermore, in *Hohmann* we stated that the parental preference must be viewed in context of the parent's parenting in the past. "The weight to be given to the promise of future right treatment arising out of the blood relationship of parent and child varies according to the surviving parent's past record of fidelity in meeting his parental obligations." *Id.* at 170, 95 N.W.2d at 647.

■ Thus, the cases make clear that ultimately the welfare of the child is the umbrella under which every aspect of custody decisions—including the parental presumption—falls. Within the reach of this over-arching concern is our recognition that the presumption favoring the surviving parent can be overcome only by evidence evincing the existence of extraordinary circumstances of a grave and weighty nature showing that the best interests of the child require that the surviving parent be denied custody. *See Wallin*, 290 Minn. at 264, 187 N.W.2d at 629. Accordingly, we conclude that following the death of a custodial parent, a surviving, noncustodial parent is entitled to custody unless the presumption that the parent be awarded custody is overcome by extraordinary circumstances of a grave and weighty nature, indicating that the best interests of the child require that the surviving parent be denied custody.

■ Having reached this conclusion, the question before us is whether the district court properly heeded these principles in its August 21, 2000, order and post-trial rulings. The district court's rulings in this case reveal that the district court responsibly undertook the great and difficult task of determining custody in this very contentious case. Nonetheless, the findings and conclusions do not clearly reflect a proper incorporation of the parental presumption into the court's analysis. While we recognize that in its post-trial order the court strongly rejected Knauff's contentions that the court applied a preponderance-of-the-evidence standard and that the evidence is not overwhelmingly in favor of granting custody to the Rodgers, we are troubled by several statements made by the district court. Specifically, we believe the following statements in the August 21, 2000, order do not properly interpret the precedent of our court recognizing the presumption favoring a surviving parent—or, at best, inject a level of confusion as to the standard to be applied in such an important matter:

> In some Uniform Parentage Act States, like Montana, the legislature has provided for an easy transition by legislating that surviving non-custodial parents such as [Knauff] become the immediate custodians of their children upon the death of the custodial parent. The Minnesota legislature and appellate courts have chosen another route and require the trial court to apply a best interest test to determine the preferred custodian. *See* Minnesota Statutes chapter 257 and *In Re Custody of N.M.O.*, 399 N.W.2d 700 (Minn.App. 1987). * * * Unfortunately or fortu-

nately, depending upon one's perspective, Minnesota trial courts are not permitted to advance a core belief that biological parents should be entitled to custody of their children vis a vis non-biological parents. Instead, trial courts must apply the best interests factors, and when that is done herein, [the Rodgers'] case is an overwhelming one because the vast majority of the best interests factors strongly favor [the Rodgers].

In other portions of the order, the district court correctly acknowledged that the welfare of the child is paramount but the court appears to have elevated tallies of the best interests factors to a degree suggesting that the sheer number of such factors, without more, can mathematically erase the presumption favoring a parent. While the best interests analysis can be very helpful in illuminating the reasoning of the district court, the essential question to be answered by the court is whether extraordinary circumstances of a grave and weighty nature exist to support the grant of permanent custody to a third party and not to a surviving parent. To that end, we agree with the district court that the law does not require that the court find that the parent is unfit or has abandoned the child in order to find extraordinary circumstances. Indeed, the fitness of a parent may not be at issue at all. *See Hohmann*, 255 Minn. at 170, 95 N.W.2d at 647. Instead what may be of concern are extraordinary circumstances such as the special needs of the child that dictate conferring custody on individuals most able to care for the child.[9] This

---

9. The dissent ignores this critical point in its exclusive focus on what it views as the fitness of the father. Our precedent has made it clear that the "extraordinary circumstances" may relate to a child's special needs and is an exception to the presumption separate from abandonment or unfitness. *Hohmann*, 255 Minn. at 168–69, 95 N.W.2d at 646–47 (holding that under a divorce decree the right to custody automatically inures to the surviving

principle was applied in *Durkin*, where there was no specific finding that the mother was unfit, and the court recognized that at least one expert determined that bonding had occurred between the mother and child. 442 N.W.2d at 153. Nonetheless custody was awarded to the third party, in part, because experts testified that returning the child to her natural mother would be "extremely detrimental and result in severe emotional and behavioral regression." *Id.*

In the instant case, the district court appears to implicitly conclude in its February 14, 2001 post-trial order that an "overwhelming case" of best interests factors favoring a third party over a parent constitutes extraordinary circumstances justifying an award of custody to the nonparent. While the law does not require that the district court use the words "extraordinary circumstances" or "grave and weighty reasons" in its conclusions of law where it awards custody to a nonparent, we cannot affirm the court's custody award when other language in the court's order seems to misapprehend our case law. While the district court may ultimately conclude such grave and weighty reasons exist to support awarding custody to the Rodgers, it must do so within the principled framework set forth in our decisions. Therefore, we hold

that the court erred. Accordingly, we remand this case to the district court for further proceedings to determine whether extraordinary circumstances of a grave and weighty nature exist here to overcome the presumption in favor of the parent.[10] When making such a determination the court's findings of fact[11] and conclusions of law must clearly take into account that the right of a parent to custody is "paramount and superior to a third person," but "must always yield to the best interest of the child" when such extraordinary circumstances exist. *Hohmann*, 255 Minn. at 170, 95 N.W.2d at 647.

Reversed and remanded.

MEYER, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

Concurring in part and dissenting in part, GILBERT, J. and PAGE, J.

GILBERT, Justice (concurring in part and dissenting in part).

I concur with most of the majority's legal analysis, but would reverse the district court outright and end this protracted litigation at this time. Not only did appellant have the right to joint legal custody of

---

natural parent unless it be shown "(1) that he is unfit, (2) that he has forfeited his custodial right as by abandonment, *or* (3) *that irrespective of his fitness, exceptional circumstances indicate that the best interests of the child clearly require that the surviving parent be denied custody* ") (emphasis added; footnotes omitted).

10. We do not address Knauff's argument that custody should have been determined under the custody modification statute, Minn.Stat. § 518.18 (1998), because he did not raise the issue in district court or in the court of appeals. Because the issue was not presented below, Knauff is barred from raising the issue on appeal, *see Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn.1988), or on remand, *Sigurdson v. Isanti County*, 448 N.W.2d 62, 66 (Minn.1989). Nevertheless, we have con-

cerns regarding the appropriateness of proceeding under Chapter 518 where one party to the marital dissolution decree is deceased and a third party is now involved.

The Rodgers also assert that Knauff's constitutional arguments are similarly barred due to his failure to raise them below. While the record is not a model of clarity, given our remand Knauff may present his constitutional arguments to the district court for consideration on the merits.

11. Because the district court judge that presided over the original custody trial has since recused himself from this case, a new custody hearing is necessary in order for the currently assigned judge to make new findings of fact. We deny the Rodgers' motion to supplement the record with the recusal order, as the order is already part of the record below.

his daughter before his ex-wife died, but he automatically retained the right to sole legal and physical custody of his daughter upon his ex-wife's death. *See In re Hohmann*, 255 Minn. 165, 168–169, 95 N.W.2d 643, 646–47 (1959). There is nothing in the record to support altering appellant's right to have custody of his daughter.

The paramount need is for this child to be with her natural father. A natural father has a fundamental liberty interest in the care, custody, and management of his child, and this interest does not evaporate simply because the natural father has not been a model parent. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Rather, in order to deprive a father of this natural right, a third person must show that there are "grave and weighty" reasons justifying such a deprivation, such as neglect, abandonment, incapacity, moral delinquency, instability of character, inability to furnish the child with needed care, or unless it has been established that such custody would not be in the best interest and welfare of the child. *Durkin v. Hinich*, 442 N.W.2d 148, 152–53 (Minn.1989); *see also Wallin v. Wallin*, 290 Minn. 261, 265, 187 N.W.2d 627, 630 (1971). There simply are no extraordinary circumstances of a grave and weighty nature to justify transferring custody from appellant to his former sister-in-law and brother-in-law. The extraordinary circumstances may be the fact that this case has taken as long as it has and has gotten as far as it has.

Neither *Durkin* nor *Wallin*, or the cases from which the *Wallin* court derived the "best interest" language, imply that a third party's ability to provide for the "interest and welfare" of a child can trump a biological parent's fundamental interest in parenthood. *See Wallin*, 290 Minn. at 266, 187 N.W.2d at 630 (citing *Fish v. Fish*, 280 Minn. 316, 159 N.W.2d 271 (1968), and

*Aske v. Aske*, 233 Minn. 540, 47 N.W.2d 417 (1951)). In *Durkin*, the biological parent had abandoned her child to the third party who was ultimately awarded custody, and there was expert testimony indicating that "returning [the child] to her natural mother would be extremely detrimental and result in severe emotional and behavioral regression." 442 N.W.2d at 148, 153. In *Wallin*, by contrast, we noted: "the evidence did not establish neglect, abandonment, incapacity, moral delinquency, or instability of character on the part of the mother * * *." 290 Minn. at 266, 187 N.W.2d at 630. While we noted that the record did not "clearly establish what disposition would be in the best welfare and interest of the child," we did not suggest that such evidence, without more, could support severing a biological parent's custodial rights in favor of a third party. *Id.* at 266–67, 187 N.W.2d at 630–31. The cases cited in *Wallin*, *Fish*, and *Aske* are particularly instructive on this point because they concerned custody disputes between biological parents in the days when there was a rebuttable presumption that the biological mother should be awarded custody. *See Fish*, 280 Minn. at 320, 159 N.W.2d at 274; *Aske*, 233 Minn. at 541–42, 47 N.W.2d at 418.

While it is true that the court stated in *Hohmann* that there may be circumstances where, "irrespective of his fitness, exceptional circumstances indicate that the best interests of the child clearly require that the surviving parent be denied custody," 255 Minn. at 169, 95 N.W.2d at 647, the cases relied on by the *Hohmann* court for that proposition did not actually grant custody to third parties, *see State ex rel. Gravelle v. Rensch*, 230 Minn. 160, 166, 40 N.W.2d 881, 884 (1950); *State v. Markson*, 187 Minn. 176, 179, 244 N.W. 687, 688 (1932); *State ex rel. Merritt v. Eldred*, 225 Minn. 72, 76, 29 N.W.2d 479, 481 (Minn. 1947)—even when the third parties were in

much better financial circumstances to provide for the child, *see Markson,* 187 Minn. at 179, 244 N.W. at 688.

The *Hohmann* court clearly contemplated circumstances where a biological parent could be unfit for custody or would waive the right to custody by abandoning a child, but its best interest analysis was narrowly focused on the "exceptional circumstances" where a child has been in the long-term custody of a third party and wishes to remain there in the face of their biological parent's attempt to gain custody. 255 Minn. at 169–73, 95 N.W.2d at 647–49. Regardless of the broad language in *Hohmann,* neither its analysis nor similar analyses in *Durkin* or *Wallin* support the conclusion reached by the majority. In other words, unless the surviving biological parent is unable or has been unwilling to serve the best interest of the child, the right of that parent to the care and custody of his minor child is paramount and superior to the right of a third person. *See Durkin,* 442 N.W.2d at 153; *Wallin,* 290 Minn. at 266, 187 N.W.2d at 630; *Hohmann,* 255 Minn. at 169, 95 N.W.2d at 647.

Appellant has been thwarted from exercising his parental rights and responsibilities, including the time period from July 15, 1999, to July 26, 1999, when the respondents had absolutely no right to take custody of N.A.K. after the mother's death without first trying to obtain court approval. Similarly, the district court had no authority to ratify respondents' decision to take custody of N.A.K. by granting their request for sole legal and physical custody, stripping these rights from the natural father. By the district court's own findings of fact in its October 4, 1999, temporary order, appellant "maintained an intimate relationship with [N.A.K.]" and videotapes of appellant with N.A.K. demonstrated a "significant degree of intimacy between [them]." The court also found that appellant had "demonstrated through videotapes a strong disposition to provide [N.A.K.] with affection. The tapes also demonstrate that [N.A.K.] feels comfortable in his presence."

The district court's August 21, 2000, permanent order found, "There is no doubt that * * * [N.A.K.] loves her father deeply. There is also no doubt that [appellant] loves [N.A.K.] deeply and wants to step in as her father and take over her care." Later in that same order the court said, "[appellant] never abandoned her and * * * the facts do not suggest that he is 'unfit' to parent." The court went on to state, "[T]he court is convinced that [appellant] has been able to maintain a warm loving relationship with [N.A.K.] despite being out of the state for most of the last four years," and, "[T]he court has no doubt that [appellant] will be equal to [respondents] in providing [N.A.K.] with love and affection." The court even conceded that it was "troubled with the prospect of permanently depriving a biological parent of the custody of his child when he is neither unfit nor has a history of abandoning that child (now that the biological, custodial mother has passed on)." The district court used a combination of marital dissolution and custody dispute statutes to reach a result that the court itself recognized as having the effect of "permanently depriving a biological parent of the custody of his child," effectively terminating appellant's parental rights. How these factual findings can add up to "grave and weighty" reasons to deprive appellant his entitlement, as a matter of law, to maintain custody of N.A.K. is beyond comprehension.

I also believe the district court erred in not exercising its inherent power to decide what evidence should be considered in its courtroom when both appellant and respondent agreed to an in camera interview

of the minor child. The guardian's preference not to have an interview should always be considered. However, that preference does not dictate what a judge can do, nor can the legislature infringe on judges' inherent powers on evidentiary matters.

The evidence is at best inconclusive. We have long held that a natural parent is entitled, as a matter of law, to custody of a minor child unless there has been established on the parent's part neglect, abandonment, incapacity, moral delinquency, instability of character or inability to furnish the child with needed care. *Durkin,* 442 N.W.2d at 152–53. None of these factors were present here. In fact, the district court's findings indicate that appellant loved his daughter, that he was not unfit, and that he had neither neglected nor abandoned her. Despite these findings, the court relied on other factors that were, at best, subjective and primarily economically biased.

Accordingly, I would reverse the district court outright and order judgment in favor of the appellant here and now.

PAGE, Justice (concurring in part and dissenting in part).

I join in the concurrence and dissent of Justice GILBERT.